UNITED STATES of America, Appellee,

v.

Isaura Figueroa CEPEDA, Appellant.

No. 1176, Docket 85–1034.

United States Court of Appeals,
Second Circuit.

Argued May 16, 1985.

Decided Aug. 5, 1985.

Lawrence M. Stern, New York City (Martin L. Schmukler, P.C., New York City), for appellant.

John K. Carroll, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Bruce A. Green, Asst. U.S. Atty., of counsel), for appellee.

Before KAUFMAN, OAKES and CARDAMONE, Circuit Judges. .

OAKES, Circuit Judge:

In 1925 Judge Learned Hand referred to conspiracy as "that darling of the modern prosecutor's nursery." *Harrison v. United States*, 7 F.2d 259, 263 (2d Cir.1925). Twenty-four years later, Justice Jackson, in a memorable opinion, referred to the history of conspiracy as exemplifying, in Cardozo's phrase, "the 'tendency of a principle to expand itself to the limit of its logic,'" protesting that "loose practice as to this offense constitutes a serious threat to fairness in our administration of justice." *Krulewitch v. United States*, 336 U.S. 440, 445–46, 69 S.Ct. 716, 719–20, 93 L.Ed. 790 (1949) (Jackson, J., concurring) (footnote omitted).

Today the Government asks us to sustain a conviction in the United States District Court for the Southern District of New York, Robert L. Carter, Judge, on a one-count indictment under 21 U.S.C. § 846 (1982) for "conspiracy" with "others unknown" to distribute or to possess with intent to distribute cocaine, a Schedule II substance, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) (1982). The overt acts cited in the indictment to support the conspiracy charge are possession of 0.41 grams ($^{14}/_{1000}$ ounce) of cocaine; residue traces of cocaine on two clear plastic bags, on two metal and plastic kitchen strainers, and on a playing card (the six of clubs); and a clear plastic bag containing 6.8 grams (less than one-quarter ounce) of lactose (also known as "cut"), a clear capped bottle containing 18.8 grams (two-thirds of an ounce) of lactose, two "Ohaus" brand triple beam scales, two boxes of plastic ziplock-type sandwich bags, and one empty green cardboard box inscribed "Deering Grams Scale." In addition to the above, four metal measuring spoons, $1,151 in cash, a wallet with identification for someone named Saul Lora, seven color photographs (some depicting Cepeda and other, unidentified persons), a telephone beeper, four telephone address diaries, and various bills and receipts were found and seized,

pursuant to an oral search warrant, at the West 93rd Street apartment concededly occupied by Cepeda and her twelve-year-old son.

The sole witness for the prosecution was a New York state trooper and narcotics investigator, Lawrence McDonald, who participated in the raid and gave expert testimony that among the seized items were the tools of a cocaine cutting mill, where relatively pure cocaine is "cut" with lactose and repackaged for sale by a middle-level distributor, that a tinfoil containing .36 grams ($^{13}/_{1000}$ ounce) of cocaine of 92.6% purity found in a dresser was characteristic of a seller's sample to a prospective buyer; and, from personal knowledge, that Cepeda when arrested had acknowledged her possession of "cut." The trooper/investigator also testified, however, that Cepeda claimed the Ohaus scales had been given to her by an unidentified person, and that the $1,151 were earnings made "off the books" at a beauty shop and as gambling winnings for herself and her sister. He further testified that the playing card is an item associated with personal use of cocaine, and that Cepeda stated that she and her twelve-year-old son had lived in the apartment for ten years. After a two-day jury trial, Cepeda was convicted and sentenced to probation for two years on condition that she engage in drug or psychiatric counseling if directed by the probation department and perform 150 hours of community service. Thus do the mighty engines of federal law enforcement grind.

■ We start with the proposition that the crime of conspiracy involves the agreement of two or more persons to commit a criminal act or acts; "[s]ince the act of agreeing is a group act, unless at least two people commit it, no one does." *Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 926 (1959). The Government reminds us, however, that (A) a person may be convicted of conspiring with persons whose identities are unknown, *United States v. Artuso*, 618 F.2d 192, 197 (2d Cir.) (citing *Rogers v. United States*, 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951)), *cert. denied*, 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980); (B) that we have often upheld conspiracy charges based on inferences from evidence of a particular defendant's activities, *United States v. Barnes*, 604 F.2d 121, 154–55 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Taylor*, 562 F.2d 1345, 1352–54 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); and (C) that there is a "mutual interdependence" of different levels in narcotics trafficking which often involves a "vertically integrated loose-knit combination," as to which a cutting mill operates at one level. *United States v. Bynum*, 485 F.2d 490, 495 (2d Cir.1973), *vacated and remanded on other grounds*, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). To add weight to this reasoning, the Government cites to us a line of cases holding that the accumulation of otherwise unexplained wealth is "highly probative" evidence of involvement in narcotics trafficking. *United States v. Young*, 745 F.2d 733, 762–63 (2d Cir.1984) ($67,320 in cash, $236,655 in jewelry, two Mercedes-Benz automobiles, $50,000 in furniture, and a $41,000 swimming pool highly probative of involvement in narcotics trafficking); *United States v. Barnes*, 604 F.2d at 147 ($1,380,000 in "miscellaneous" income by five individuals over three-year period); *United States v. Viserto*, 596 F.2d 531, 535–36 (2d Cir.) (proof of "substantial" cash expenditures by defendants permissible—testimony as to payments to defendants of over $1 million), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979).

■ To discuss the Government's points one at a time, it is of course true that parties cannot agree if they are not aware of the agreement, *United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128 (1940), although they can agree without being aware of one another's identity, *Blumenthal v. United States*, 332 U.S. 539, 557–58, 68 S.Ct. 248, 92 L.Ed. 154 (1947). *See also Developments in the Law—Criminal Conspiracy, supra*, at 927–29; Note, *Resolution of the Multiple*

*Conspiracies Issue Via a "Nature of the Enterprise" Analysis: The Resurrection of Agreement,* 42 Brooklyn L.Rev. 243, 248 & n. 18 (1975). But it is also true that the evidence must support the existence of such unknown persons and their complicity. *See United States v. Maniego,* 710 F.2d 24, 26 (2d Cir.1983) (per curiam) (upholding conviction of conspiracy involving married couples and unidentified individuals who backdated and falsified blood test reports at medical laboratories for marriage licenses); *United States v. Albert,* 675 F.2d 712, 713–14 (5th Cir.1982). And that evidence must relate to more than a simple sale from seller to buyer, *United States v. Zeuli,* 137 F.2d 845, 846 (2d Cir.1943), absent a prior or contemporaneous understanding beyond the mere sales agreement, *see United States v. Martin,* 599 F.2d 880, 888–89 (9th Cir.1979) (citing cases); *United States v. Ford,* 324 F.2d 950, 952 (7th Cir. 1963). Not every illicit sale is a conspiracy. *See United States v. Falcone,* 109 F.2d 579, 581 (2d Cir.), *aff'd,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).[1]

Here there was not even evidence of a sale. Nor can appellant's intent to enter into a conspiracy be inferred from the presence and her mere possession of paraphernalia usable, or inferably previously used, in drug-cutting. Thus, evidence that a defendant resided at an apartment occupied by several others and used as a cutting mill, even coupled with knowledge that a crime was being committed there, has been found insufficient to sustain a conspiracy conviction. *United States v. Soto,* 716 F.2d 989, 991–92 (2d Cir.1983). So, too, one who "cased" a bank for bank robbers could not be held guilty absent evidence of a knowing agreement to rob the bank or conscious assistance in the commission of the crime in an active way. *United States v. Di Stefano,* 555 F.2d 1094, 1103 (2d Cir.1977). Nor will comfort or assistance to a member of an aborted or completed conspiracy make a defendant a participant in the conspiracy. *See United States v. Freeman,* 498 F.2d 569, 575 (2d Cir.1974) (defendant not a conspirator simply by virtue of efforts to conceal conspirators after initial scheme miscarried). In each of these cases, and others, the court has insisted on proof, whether or not by circumstantial evidence, *see United States v. Manfredi,* 488 F.2d 588, 596–97 (2d Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974), of a specific agreement to deal. Having the paraphernalia in the apartment is as consistent with someone's having left it there, with personal use, future intent, or even some single sale in the past as it is with conspiracy on or about the date of the indictment, especially since the trooper/investigator testified that there was no way to know when the paraphernalia had arrived or been used.[2] In addition, the quantity of cocaine found in Cepeda's apartment was not inconsistent with personal use; and, to the contrary, the presence of the six of clubs *suggested* personal use. To be sure, there was the supposed "sample," the ¹³/₁₀₀₀ of an ounce of cocaine, and there were the fractions of an ounce of

---

1. Indeed, the district court charged, quite correctly, we think, that, contrary to the Government's argument to the jury that the seller or buyer could be the coconspirator, in this case "two or more persons ... [must] come to an understanding to violate the law, *here the packaging and distribution of cocaine*" (emphasis added).

2. During cross-examination of Investigator McDonald, the following colloquy took place:

    Q. Certain of those [seized] articles had some residue on them, is that right? You have indicated the strainer had a powdery, appeared to have a powdery residue on it, the measuring spoons, and you indicated also that some baggies likewise had some reside [*sic*] in the recesses of the containers, is that right?
    A. Yes, sir, that's right.
    Q. Do you know when those residues got there?
    A. No, sir.
    Q. Do you know when those articles got into this apartment?
    A. No, sir.
    Q. Do you know if they had been in that apartment for hours, days, weeks, months, years?
    A. I don't know, counsel.
    Q. Did you ever observe any traffic going into and out of that apartment?
    A. No, sir.

"cut," but such quantities are also consistent with personal use.

As for the unexplained "wealth," in one of the very cases cited by the Government, *United States v. Young*, 745 F.2d at 764, this court reversed the conviction of a defendant in part because of the insufficiency of evidence connecting her with "a relatively small amount of unexplained wealth ($6,000 worth of jewelry and two fur coats)." We do not think $1,151, even in an apartment at West 93rd Street, indicative of very much,[3] and it was at least accompanied by an explanation (working "off the books" at the beauty shop—tips?; gambling—numbers?). In any event, the amount certainly does not, in the year 1984, approach the magnitude of unexplained wealth involved in the narcotics conspiracy cases cited, as well as those on which the Government relies, *e.g., United States v. Tramunti*, 513 F.2d 1087, 1100, 1105 (2d Cir.) ($967,450), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Falley*, 489 F.2d 33, 38 & n. 1 (2d Cir.1973) ($20,000 spent on air travel in two years by person with total income of $10,-000 in the same period of time); *United States v. Kenny*, 462 F.2d 1205, 1219 (3d Cir.) ($2 million), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972).

Even assuming that one may build inference on inference, *but cf. United States v. Pena*, 527 F.2d 1356, 1364–65 (5th Cir.) (rejecting sufficiency of evidence for conspiracy based on inferential evidence of possible unknown conspirators), *cert. denied*, 426 U.S. 949, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976), it simply cannot be said that a reasonable juror could find Cepeda guilty of conspiracy beyond a reasonable doubt. Since Cepeda was not prosecuted for simple possession under 21

U.S.C. § 844, the conviction must be reversed.[4]

We do not reach the additional points argued—the admissibility of expert testimony as to the distribution of cocaine in New York City, the court's charge on false exculpatory statements, and the validity of the search.

Judgment reversed.

---

3. For example, the presence of $1,151 in cash in an apartment on West 93rd Street might well reflect the difficulties encountered by low-income families seeking basic banking services in this day of banking deregulation. *See, e.g., Deregulating Away the Little Guy*, N.Y. Times, Feb. 19, 1984, § 3, at 12, col. 3; N.Y. Times, Feb. 13, 1984, at D1, col. 6.

4. The original indictment, filed September 20, 1984, stated two counts against Cepeda—one for conspiracy and the other for possession with intent to distribute. The latter count, however, was dropped in a superseding indictment that was filed on November 13, 1984, the day before Cepeda's trial began.