**UNITED STATES of America,
Appellee,**

v.

**Yahya BICAKSIZ and Sergey Krutikov,
Defendants–Appellants,**

**Zaour Kapaev and Magomed
Sadoulaev, Defendants.**

**Docket Nos. 98–1576, 98–1592**

United States Court of Appeals,
Second Circuit.

Argued May 5, 1999.

Decided Oct. 15, 1999.

Ronald L. Kuby, New York, New York (Daniel M. Perez, on the brief), for Defendant–Appellant Bicaksiz.

Howard L. Jacobs, New York, New York, for Defendant–Appellant Krutikov.

David Hennessy, Assistant United States Attorney for the Eastern District of New York (Zachary W. Carter, United States Attorney, Peter A. Norling, Assistant United States Attorney, on the brief), for Appellee.

Before: CABRANES and SACK, Circuit Judges, and SHADUR, District Judge.*

JOSÉ A. CABRANES, Circuit Judge:

Yahya Bicaksiz and Sergey Krutikov appeal from judgments of conviction entered in October 1998 by the United States Dis-

---

* The Honorable Milton I. Shadur, of the United States District Court for the Northern District of Illinois, sitting by designation.

trict Court for the Eastern District of New York (Nina Gershon, *Judge* ), after a jury trial, convicting each of them of one count of conspiracy to travel in interstate commerce with intent to commit a murder for hire (Count I of the indictment) and convicting Bicaksiz alone of the substantive offense of traveling in interstate commerce with intent to commit a murder for hire (Count II), all in violation of 18 U.S.C. § 1958.

Bicaksiz challenges his judgment of conviction on three grounds. First, he contends that Congress did not intend to allow separate sentences for conspiracy and a substantive offense under 18 U.S.C. § 1958. Second, he contends that the District Court erred in admitting into evidence the testimony of his wife that he had threatened to kill her. Finally, he argues that it was error for the District Court to deny his motion for a downward departure for ineffective assistance of counsel and to decline his request to hold an evidentiary hearing on this motion. Krutikov's sole claim on appeal is that the evidence of his involvement in the conspiracy was insufficient to convict him. For the reasons set forth below, we affirm the judgments in all respects.

## I.

The following is an account of the evidence presented at trial, which we are required to view in the light most favorable to the government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Frank*, 156 F.3d 332, 334 (2d Cir.1998). Most of the events relating to the murder scheme took place in January or February 1998.

In November 1997, Bicaksiz separated from his wife of almost ten years, Bedriye Bicaksiz ("Bedriye"). The separation followed the couple's meeting in October 1997 with a lawyer. Bedriye testified at trial that, at about that time, Bicaksiz told her "if you touch my businesses I will die," and she replied "I'm not touching your businesses." Among Bicaksiz's businesses were a "halal" [1] meat market in Pennsylvania and a Turkish restaurant in Union City, New Jersey. On one occasion later in October, Bicaksiz yelled at Bedriye that he hated her brother, Osman Esen, and that she and her brother came from a "very free liberal family." On December 5, 1997, Bedriye changed her mind about the divorce settlement and told the couple's lawyer that "whatever he has I want half of it."

In January 1998, Zaour Kapaev, an employee at Bicaksiz's halal meat market in Pennsylvania, telephoned Magomed Sadoulaev at Bicaksiz's behest to arrange a meeting with Bicaksiz. Sadoulaev had become acquainted with Bicaksiz and Kapaev during previous visits to Bicaksiz's meat market.

A few days after the phone call, Kapaev and Bicaksiz drove to the Brighton Beach neighborhood of Brooklyn, New York, to meet with Sadoulaev. At that meeting, Bicaksiz told Sadoulaev that he wanted to kill Osman Esen and that he had contacted Sadoulaev in the hope that he knew someone who would be willing to carry out the murder in exchange for money. Sadoulaev agreed to inquire about a hitman.

Shortly thereafter, Sadoulaev contacted David Vayzer, whom he had met about two-and-a-half years earlier while doing maintenance work at the building in Brighton Beach where Vayzer lived. When Sadoulaev later visited Vayzer at his home, he inquired about a friend of Vayzer's, Sergey Krutikov, who also had lived in Vayzer's building. In response, Vayzer told Sadoulaev (untruthfully) that he had not seen Krutikov for a long time. Sadoulaev then turned to the subject of the murder-for-hire plot and asked Vayzer if he knew anyone who could carry it out. Vayzer offered to do it himself because, he

---

1. "Halal" foods are those prepared in accordance with Islamic religious law. *See, e.g.,* Cyril Glasse, *The Concise Encyclopedia of Islam* 133, 144, 148 (1989).

said, he needed the money; he told Sadoulaev that he had a gun and that he did not want to involve anyone else. Sadoulaev did not refer to Bicaksiz or Kapaev by name, nor did he ever reveal their identities to Vayzer. Similarly, it appears from the record that Bicaksiz and Kapaev were never informed of Vayzer's identity.

On being told that he would be paid $10,000 for the murder, Vayzer said he would need $15,000, with $5,000 paid in advance, and a photograph and the address of Esen, the intended victim. Sadoulaev asked Kapaev to call Bicaksiz, who agreed to Vayzer's terms. Sadoulaev then told Vayzer to meet him in Paterson, New Jersey the following evening. Before meeting with Sadoulaev, Vayzer had second thoughts about committing the murder and expressed his concerns to his friend Krutikov, the man about whom Sadoulaev had inquired when Vayzer was first contacted. According to Vayzer's testimony, Krutikov told Vayzer that he (Krutikov) would be willing to commit the murder and that "everything was bad in his life and he didn't want to live." Krutikov, who was a livery car driver, drove Vayzer to Paterson for the meeting with Sadoulaev.

In Paterson, Sadoulaev first met with Bicaksiz and Kapaev to collect the $5,000 advance and Esen's photograph and address. He later met with Vayzer alone to relay these items. Prior to their meeting, Vayzer spoke with Sadoulaev on the telephone. Vayzer told Sadoulaev (falsely) that he (Vayzer) was alone; the record of the trial does not suggest that Vayzer ever mentioned Krutikov to Sadoulaev or even hinted at any time that he (Vayzer) had recruited another person to join the conspiracy.

After leaving Sadoulaev, Vayzer momentarily took shelter in a restaurant, separated $3,000 from the money he had been given, and rejoined Krutikov, telling him that he had received only $3,000 and did not expect to get the entire sum before the murder went forward. On arriving back in Brooklyn, Vayzer paid Krutikov a livery service fee of $100 for driving him to New Jersey. He then went to the police. In cooperation with the police and the FBI, Vayzer recorded conversations he had with Sadoulaev on February 12, 1998, and with Krutikov four days later. In the latter conversation, Krutikov reiterated his interest in committing the murder but stated that he did not want to meet with Sadoulaev. Krutikov apparently knew that Sadoulaev was the intermediary with whom Vayzer had been negotiating, because in the course of police-recorded conversations with Vayzer, Krutikov referred several times to "Maga," which is Sadoulaev's nickname.

Krutikov and Sadoulaev were arrested on February 16, 1998, and Sadoulaev agreed to cooperate. The next day Sadoulaev recorded conversations with Bicaksiz and Kapaev, who were subsequently arrested.

In a two-count indictment filed February 26, 1998, a grand jury charged Bicaksiz, Kapaev, Sadoulaev, and Krutikov with one count of traveling in interstate commerce "with intent that a murder be committed" in exchange for money, in violation of 18 U.S.C. § 1958, and one count of conspiracy to travel in interstate commerce "with intent that a murder be committed" in exchange for money, also in violation of 18 U.S.C. § 1958.

Sadoulaev pleaded guilty to both counts, but Bicaksiz, Kapaev, and Krutikov were tried by a jury before Judge Gershon. Bicaksiz and Kapaev were convicted on both counts, and Krutikov was convicted on the conspiracy count only.

Judge Gershon sentenced Bicaksiz (the only defendant appealing on a sentencing issue) principally to a total term of imprisonment of 215 months—120 months on the conspiracy count, and (consecutively) 95 months on the substantive count. She sentenced Krutikov principally to imprisonment for 100 months. After sentencing, Bicaksiz and Krutikov brought this appeal. Kapaev has filed a notice of appeal, but his

appeal is pending before another panel of this Court.

## II.

### A. Bicaksiz's "Consecutive Sentences"[2]

■ Bicaksiz first argues on appeal that the District Court erred in imposing "consecutive sentences" for his conspiracy and substantive offense convictions under 18 U.S.C. § 1958[3]—that is, in imposing separate sentences for each of the charged offenses.

Bicaksiz relies principally on cases from other circuits holding that a defendant may not receive multiple sentences for violating multiple subsections of another statute, 18 U.S.C. § 922(g). *See, e.g., United States v. Munoz–Romo,* 989 F.2d 757 (5th Cir.1993); *United States v. Winchester,* 916 F.2d 601 (11th Cir.1990). Section 922(g) prohibits the shipment or receipt of a firearm or ammunition by certain types of individuals—such as convicted felons and drug addicts—enumerated in the statute's subsections.[4] In *Winchester,* the Court of Appeals for the Eleventh Circuit held that "Congress did not intend to pro-

vide for the punishment of a defendant under two or more separate subdivisions of 18 U.S.C. § 922(g)." *Winchester,* 916 F.2d at 607. The *Winchester* Court reasoned that § 922(g) was meant to be used to keep guns out of the hands of certain categories of persons, not to punish individuals for having a particular status, such as that of convicted felon, drug addict, or "illegal alien." The *Winchester* Court also noted that a contrary interpretation would allow a defendant who is a convicted felon and is also a fugitive from justice, a drug addict, a "mental defective," and an "illegal alien," to be sentenced to five separate terms for the same incident. *Id.* at 607.

These § 922(g) cases, however, are inapposite. The multiple convictions of Bicaksiz are attributable not to his multiple characteristics or statuses but, instead, to the fact that he both committed a substantive offense and engaged in a conspiracy to commit that offense. The Supreme Court has long held that these are separate and distinct offenses that permissibly may result in the imposition of cumulative sentences. *See Callanan v. United States,* 364 U.S. 587, 593, 81 S.Ct. 321, 5 L.Ed.2d

**2.** Although Bicaksiz refers to "consecutive sentences," the argument on appeal refers to the imposition of separate sentences for the substantive crime and the conspiracy to commit the substantive crime. During sentencing, counsel for Bicaksiz conceded that, if the multiple sentences were valid, "the guidelines [would] permit the imposition of an aggregate sentence in consecutive fashion."

**3.** Section 1958 reads, in pertinent part, as follows:

Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, ... with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both[.]

18 U.S.C. § 1958(a).

**4.** At the time these cases were decided, 18 U.S.C. § 922(g) read as follows:

It shall be unlawful for any person—
(1) who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year;
(2) who is a fugitive from justice;
(3) who is an unlawful user of or addicted to any controlled substance ...;
(4) who has been adjudicated as a mental defective or who has been committed to a mental institution;
(5) who, being an alien, is illegally or unlawfully in the United States;
(6) who has been discharged from the Armed Forces under dishonorable conditions; or
(7) who, having been a citizen of the United States, has renounced his citizenship;

to ship or transport in interstate or foreign commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g) (1988). Since that time, the statute has been amended, *inter alia,* to add to the list stalkers and those convicted of a misdemeanor crime of domestic violence.

312 (1961). The *Callanan* Court explained:

> This settled principle derives from the reason of things in dealing with socially reprehensible conduct: collective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish.

*Id.; see also United States v. Ramirez–Amaya,* 812 F.2d 813, 817 (2d Cir.1987) ("[C]onspiracies have traditionally been viewed as offenses that cause kinds of harm that are distinguishable from the harm caused by the underlying substantive offenses."). Moreover, the *Callanan* Court held that Congress had exercised its clear prerogative to authorize separate, potentially cumulative sentences for conspiracy and substantive offenses when it amended the statute at issue there, 18 U.S.C. § 1951, which is similar in structure to § 1958. *Id.* at 594–595, 81 S.Ct. 321.[5]

Seeking to distinguish § 1958 from § 1951, Bicaksiz claims that the pre-enactment structure of the Hobbs Act Amendments of 1946 (which amended § 1951) demonstrates that Congress *in that instance* intended conspiracy and substantive offenses to be punished separately.[6] Specifically, he contends that the separation of the conspiracy and substantive provisions of the Hobbs Act Amendments into distinct paragraphs indicates a legislative intention to provide for separate—and, thus, possibly cumulative—punishments. He argues that § 1958, in contrast, was not enacted in this form and, therefore, that the teaching of *Callanan* is simply not applicable to § 1958.

■ The argument is not persuasive. In holding that § 1951 imposed separate, potentially cumulative punishments for conspiracy and substantive offenses, the Supreme Court in *Callanan* did not rely on the structure of the Hobbs Act Amendments.[7] Instead, the *Callanan* Court rea-

---

**5.** At the time *Callanan* was decided, the pertinent part of § 1951 read as follows:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a) (as reproduced in *Callanan,* 364 U.S. at 588 n. 1, 81 S.Ct. 321).

**6.** The relevant portions of the Hobbs Act Amendments of 1946, 60 Stat. 420, from which the codification in § 1951 was compiled, are reproduced in *Callanan,* 364 U.S. at 588 n. 1, 81 S.Ct. 321, as follows:

> Sec. 2. Whoever in any way or degree obstructs, delays or affects commerce, or the movement of any article or commodity in commerce, by robbery or extortion, shall be guilty of a felony.
> Sec. 3. Whoever conspires with another or with others, or acts in concert with another or with others to do anything in violation of section 2 shall be guilty of a felony.
> Sec. 4. Whoever attempts or participates in an attempt to do anything in violation of section 2 shall be guilty of a felony.
>
> . . . . .
>
> Sec. 6 Whoever violates any section of this title shall, upon conviction thereof, be punished by imprisonment for not more than twenty years or by a fine or not more than $10,000, or both.

*Id.* According to *Callanan,* "[t]he Reviser's Note to the 1948 Code states that 'The words "attempts or conspires so to do" were substituted for sections 3 and 4 of the 1946 act.' " *Id.*

**7.** The Court's non-reliance on the structure of the amendments is hardly surprising, for two reasons. First, as a general matter, the sentence and paragraph structure of a statutory amendment is not a Rosetta Stone of statutory construction from which, alone, we can draw definitive conclusions regarding congressional intent. Second, and more specifically, it is clear that the sentence structure of the Hobbs

soned that when Congress passed the Amendments, it was "not ... unfamiliar with the commonplaces of our law," 364 U.S. at 594, 81 S.Ct. 321, including the principle that a substantive offense and conspiracy are separate convictions for which separate punishments may be imposed. Furthermore, the Court noted that Congress had passed the Hobbs Act Amendments after *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), in which the Court had affirmed separate, cumulative sentences for conspiracy to monopolize and monopolization, both of which were made criminal by § 2 of the Sherman Act. *See Callanan*, 364 U.S. at 594–95, 81 S.Ct. 321. The Court concluded: "To dislodge such conventional consequences in the outlawing of two disparate offenses, conspiracy and substantive conduct, and effectuate a reversal of the settled interpretation we pronounced in *American Tobacco* [,] would require specific language to the contrary." *Id.* at 595, 81 S.Ct. 321.

The statutory backdrop of § 1958 is, if anything, even more compelling than that of § 1951, because § 1958 was enacted after *Callanan*. Like § 1951, § 1958 criminalizes both substantive offenses and conspiracy, without any specific language precluding cumulative punishment of a defendant, such as Bicaksiz, who commits both. Accordingly, we hold that Bicaksiz's separate, cumulative sentences are authorized by the statute.

### B. Admissibility of Bicaksiz's Wife's Testimony

■ Bicaksiz argues also that the District Court erred at trial in refusing to exclude, pursuant to Fed.R.Evid. 403, Bedriye's testimony that Bicaksiz told her "if

you touch my businesses I will die." Bicaksiz interprets the statement attributed to him as a death threat against Bedriye, and argues that it should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403.

■ We review the District Court's rulings on the admissibility of evidence for abuse of discretion, and "[w]e will overturn a trial judge's determination under Rule 403 only if we determine that the judge acted arbitrarily or irrationally." *United States v. Tracy*, 12 F.3d 1186, 1195 (2d Cir.1993) (finding no abuse of discretion with respect to admission of evidence of death threats by defendant).

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We have held that "[e]vidence of threats of death is subjected to the same Rule 403 balancing test as other relevant evidence, though the stakes may be heightened." *Tracy*, 12 F.3d at 1195 (citation omitted). In the instant case, the District Court did not abuse its discretion by admitting Bedriye's testimony. The Court held that the evidence of the threat was intrinsic to the crimes of conviction because it was

> part of the government's basic theory that the murder of the brother was intended to intimidate the wife. Had the alleged murder plot been successful, then under the government's theory the wife would have been made so fearful for her life based upon the threat to her and her brother and fortified by the

Act Amendments did not express congressional intent with respect to punishment. For example, the Amendments dealt with attempt and substantive offenses in separate paragraphs, even though a defendant cannot be convicted of both attempt and a substantive offense, let alone be punished for both. *See, e.g., United States v. Madonna*, 582 F.2d 704,

705 (2d Cir.1978); *United States v. Moss*, 562 F.2d 155, 159 (2d Cir.1977); *United States v. Hunter*, 478 F.2d 1019, 1023 (7th Cir.1973). It makes little sense in these circumstances to suggest that, by itself, the use of separate paragraphs evinces congressional intent to authorize separate, potentially cumulative punishments.

murder of her brother that she would have relented from her position in the divorce proceedings.

We agree that Bedriye's testimony at trial was probative of the government's contention that the projected murder of Esen was part of a scheme to intimidate Bedriye into accepting a disadvantageous divorce settlement,[8] and we find no error, much less arbitrariness or irrationality, in the District Court's decision to admit it.

## C. Bicaksiz's Request for Downward Departure for Ineffective Assistance of Counsel

Bicaksiz next argues that the District Court should have granted him a downward departure at sentencing because of the ineffective assistance of his original trial lawyer, or, at a minimum, that the District Court should have held an evidentiary hearing on the question.

■ Bicaksiz argues that his counsel at the time he entered a plea of not guilty, Jeffrey Cohn, was ineffective because Cohn told Bicaksiz that, if convicted at trial of both the conspiracy and substantive violation counts of the indictment, his maximum sentence would be ten years (the maximum term of imprisonment for a single violation of 18 U.S.C. § 1958).

According to Bicaksiz, Cohn believed consecutive sentences were not an option because Assistant United States Attorney David Hennessy, when asked at a detention hearing if Bicaksiz could receive consecutive sentences for the conspiracy and the substantive crime, told the magistrate judge, "In my experience, I believe that— not that they would merge, but I believe that it would be concurrent, in all fairness. I believe that that's what the result would

be." Prior to sentencing, the government changed its view and argued that Bicaksiz should receive consecutive sentences.

Bicaksiz claims that his attorney's erroneous advice about the maximum sentence prevented him from entering into serious plea discussions with the government. On this basis, Bicaksiz's new counsel, Ronald Kuby, moved at sentencing for a downward departure due to ineffective assistance of counsel. The District Court declined to give Bicaksiz the requested downward departure, stating that the request was "based upon a single statement made by Mr. Hennessy at the detention hearing." The Court found that Hennessy's statement did not suffice to create a ground for departure, but that "[i]n any event, even if I were to assume that something about that statement constituted a lawful ground for a departure, departure is solely within the Court's discretion, and given the facts of this case, I would and do decline to depart downward." On appeal, Bicaksiz argues that the District Court erroneously failed to consider that his downward departure request was grounded not only in the government's statement that any sentences would be concurrent, but also in defense counsel's alleged advice that the maximum sentence for both offenses would be ten years.

■ Whatever the merits of Bicaksiz's claim of ineffective assistance of counsel, which we are not required to address at this time, the District Court properly declined to hold a hearing on the matter and properly denied the motion for a departure on that basis. This asserted species of departure has been mentioned in our cases only in glancing dicta, and we have never endorsed it.[9] Squarely presented with the

---

8. This is true even though, contrary to the government's proffer and to the District Court's understanding of Bedriye's putative testimony containing the quoted statement, in the end Bedriye never testified that Bicaksiz threatened to kill her brother.

9. In *United States v. Gordon*, 156 F.3d 376 (2d Cir.1998), we noted that the District Court

had denied, on unspecified grounds, defendant's request for a downward departure based on ineffective assistance of counsel. It subsequently granted defendant's motion for habeas corpus relief under § 2255 for ineffective assistance after hearing substantially the same arguments made earlier at sentencing. *Id.* at 378. On appeal, we did not address the

question for the first time, we now answer it in the simplest and most categorical terms: Ineffective assistance of counsel is not a basis for a downward departure at sentencing. A finding that a convicted defendant has received ineffective assistance of counsel necessarily calls into question the validity of the conviction. By contrast, the imposition of a sentence (with or without a downward departure) and the entry of judgment necessarily assumes the validity of the conviction. A downward departure on ineffective assistance grounds is impermissible because it simultaneously assumes the validity of a defendant's conviction and conspicuously calls its validity into doubt. Accordingly, we hold that the District Court did not err in denying Bicaksiz a downward departure for ineffective assistance of counsel, or in denying a request for a hearing on the question. Our decision on this score is without prejudice to the possible raising of the ineffective-assistance contention in a separate § 2255 motion.

### D. Sufficiency of the Evidence Underlying Krutikov's Conviction

■ Krutikov argues on appeal that there was insufficient evidence at trial to support his conviction of conspiracy. Specifically, he claims that there was no evidence of an agreement between him and any other conspirator.

■ Krutikov bears a "very heavy burden" in challenging the sufficiency of the evidence that led to his conviction. *United States v. Keats*, 937 F.2d 58, 62 (2d Cir. 1991). In considering any such challenge, we view all proof in the light most favorable to the government and draw all reasonable inferences in the government's favor. *See id.* We must uphold a conviction if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)(emphasis in original).

■ An essential element of the crime of conspiracy is an agreement. *See, e.g., Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). We have taken a "bilateral approach" to the crime of conspiracy. *See United States v. Yu–Leung*, 51 F.3d 1116, 1122 n. 3 (2d Cir.1995); *United States v. Gaviria*, 740 F.2d 174, 184–85 (2d Cir. 1984). In other words, "[u]nless at least two people [agree], no one does. When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone." *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir.1977) (citations omitted).

There is substantial evidence in the instant case that Krutikov intended to be involved in the murder-for-hire plot. He knew the plot existed, he told Vayzer that he would carry out the murder in exchange for money, he knew of the existence and intermediary role of Sadoulaev, and he drove Vayzer to Paterson to meet with Sadoulaev and collect the advance payment. Krutikov correctly argues, however, that he could not reasonably have been found to have conspired with Vayzer. While it is clear that Krutikov's agreement with Vayzer to travel to Paterson was a step toward committing the murder for hire, that agreement was not an agreement with a co-conspirator, because the government does not claim that Vayzer was a conspirator at any time. Indeed, the government's arguments on appeal all

appropriateness of a downward departure based on ineffective assistance of counsel except to say in a footnote that "[i]t is quite odd that this request for downward departure was made pursuant to U.S.S.G. § 5K1.1," which covers " 'Substantial Assistance to Authorities'..... In hindsight, we think that [defen-

dant's] request should have been made pursuant to U.S.S.G. § 5K2.0, which covers grounds for departure 'not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.' " *Id.* at 377 n. 1.

assume that Vayzer was *not* a conspirator. Moreover, in a statement underscoring the government's theory of its case, the District Court explicitly instructed the jury that "the government has not charged that David Vayzer is a conspirator. However, one conspirator can conspire with other conspirators, even though their identities are unknown to him and he can do so through an intermediary who is not himself a conspirator."

 Because the government effectively conceded that Vayzer was not a conspirator at any time, and the District Court instructed the jury accordingly, we agree that Krutikov could not properly have been found guilty of conspiracy for agreeing with Vayzer alone. *See Rosenblatt,* 554 F.2d at 38. Nevertheless, Krutikov reasonably could have been found guilty of conspiracy on the theory that he agreed with the actual conspirators "through" Vayzer. A "person can be convicted of conspiring with persons whose names are unknown." *Rogers v. United States,* 340 U.S. 367, 375, 71 S.Ct. 438, 95 L.Ed. 344 (1951); *United States v. Cepeda,* 768 F.2d 1515, 1516 (2d Cir.1985) (conspirators "can agree without being aware of one another's identity"). Moreover, parties can conspire through a non-conspiring intermediary, even a government informant. *United States v. Medina,* 32 F.3d 40, 44–45 (2d Cir.1994). However, while it is true that parties may agree—*i.e.,* may conspire with each other—without being aware of one another's identity, the evidence must support an inference that, at a minimum, the accused conspirators knew there were other participants in the conspiracy. *See id.* at 45 ("A defendant can conspire with individuals he has never met, so long as he participates *and is aware of their assistance in the criminal venture.*" (emphasis added)); *Cepeda,* 768 F.2d at 1517 ("[T]he evidence must support the existence of such unknown persons and their complicity.").

In *United States v. Sanchez Solis,* 882 F.2d 693 (2d Cir.1989), for example, a federal agent arranged with an individual, Luis Gonzalez, to buy a kilogram of cocaine. Gonzalez stated that the cocaine would be delivered in a blue car. A short time later, appellant Sanchez arrived in a blue car and delivered a package of cocaine to Gonzalez. Sanchez appealed his conviction, claiming that there was no evidence that he knew Gonzalez or knew that the package contained cocaine. We held that "the government was not required to prove that Gonzalez and Sanchez conspired directly with each other." *Id.* at 696. Rather, it was enough that Sanchez knew *someone* would be waiting at a specified location to receive the package, even if he did not know the identity of the person. By delivering the cocaine, Sanchez implicitly acknowledged that he was aware of the participation of others in the scheme, even if he knew nothing of their identity.

Krutikov argues that there is no evidence in this case that the original conspirators—Bicaksiz, Kapaev and Sadoulaev—knew that someone other than Vayzer was willing to join the conspiracy. Vayzer communicated only with Sadoulaev, and he (Vayzer) never told Sadoulaev that he had recruited another person to kill Esen. Nor did Vayzer ever hint to Sadoulaev, his intermediary, that there might be another person involved. On the contrary, Vayzer made clear to Sadoulaev that he did not wish to involve anyone else. In addition, Sadoulaev never indicated, implicitly or explicitly, any willingness to have others participate in the conspiracy. Because there is no evidence in this record to suggest that Sadoulaev knew or acknowledged the existence of anyone other than Vayzer as the potential hitman, Krutikov argues, the requisite agreement between Krutikov and other conspirators is absent.

We disagree. We need not decide whether a Krutikov–Sadoulaev conspiracy is precluded by the latter's affirmative belief that Vayzer, and none other, would act as the hitman. Even if that were the case, it would be possible for Krutikov to have

conspired with Bicaksiz[10]—who knew that *someone* was to be hired as a hitman but who knew nothing of the hitman's identity, and therefore, unlike Sadoulaev, had no reason to believe that the hitman would be Vayzer (or any other particular person). Thus, as in *Sanchez Solis,* there is evidence in this case to support the inference that each of two individuals—here, Krutikov and Bicaksiz—was aware of the other's existence and participation in the scheme, even if they were not aware of each other's identity. At one end of the conspiracy was Bicaksiz, who knew that, at his behest, Sadoulaev would arrange for someone to kill Esen.[11] At the other end was Krutikov, who learned through Vayzer that an unnamed person or persons had offered to pay for the murder of Esen. In short, although Bicaksiz and Krutikov were unaware of each other's identity, there is sufficient evidence in the record for the jury to have reasonably found that each was aware of an unknown participant playing an assigned and understood role in furtherance of the criminal venture. Sadoulaev may have believed that Vayzer would carry out the killing himself, but his understanding does not alter the fact that both Bicaksiz and Krutikov were willing to participate—and *did* participate—in a scheme that each knew included other, unidentified persons who would take predictable steps in furtherance of the same illicit goal.

Because we find that the evidence supports the conclusion that both Bicaksiz and Krutikov knew of "the existence of ... unknown persons and their complicity" in the conspiracy, *Cepeda,* 768 F.2d at 1517, we conclude that the government presented sufficient evidence of the agreement to establish the crime of conspiracy.

## III.

To summarize:

(1) We hold that the federal statute that proscribes murder for hire, 18 U.S.C. § 1958, permits separate and cumulative punishment of Bicaksiz for both *conspiracy* to travel in interstate commerce with the intent to commit murder for hire and *the substantive offense* of traveling in interstate commerce with the intent to commit murder for hire.

(2) We conclude that the District Court did not err in admitting into evidence the testimony of Bicaksiz's wife regarding statements by Bicaksiz that could be interpreted as a death threat against her.

(3) With respect to the sentence imposed on Bicaksiz, we conclude that there is no such thing as a downward departure for ineffective assistance of counsel and, therefore, that the District Court did not err in denying Bicaksiz's motion for such a departure or in declining the request by Bicaksiz's newly retained lawyer to hold a hearing on that question.

(4) We conclude that the evidence was sufficient to support the conviction for conspiracy under 18 U.S.C. § 1958 of Krutikov, a sub-contractor of the original hitman (the latter of whom became a government informant and is not regarded by the government or the District Court as a co-conspirator), even though the persons soliciting the murder for hire (Bicaksiz and Kapaev) were not aware of the hitman's identity, and Krutikov, in turn, did not know the identity of those who initiated the murder scheme (Bicaksiz and Kapaev).

Accordingly, we affirm in all respects the judgments entered by the District Court with respect to Bicaksiz and Krutikov.

10. For ease of reference we speak of Bicaksiz only, but we note that Kapaev and Bicaksiz were similarly situated in these and other respects.

11. There is no evidence in the record that Bicaksiz knew that Vayzer was the person Sadoulaev had recruited to kill Esen. On the contrary, the record shows that Bicaksiz did not want to know the identity of the hitman.