UNITED STATES of America

v.

Raymond VALENCIA, a/k/a
"Panama," Defendant.

No. 98 CR 180(DC).

United States District Court,
S.D. New York.

Oct. 7, 2002.

James B. Comey, United States Attorney for the Southern District of New York, By John P. Collins, Jr., David Esseks, Assistant United States Attorneys, New York City, for U.S.

Gino Josh Singer, New York City, for Defendant, Raymond Valencia.

### OPINION

CHIN, District Judge.

In this unusual criminal case, defendant Raymond Valencia is charged in a one-count indictment with conspiracy to distribute and possess with intent to distribute cocaine. The indictment does not identify any alleged co-conspirators and the only overt acts charged in the indictment relate to Valencia's dealings with a confidential source who was acting at the direction of law enforcement. Valencia pled guilty to the charge in April 1999 and was sentenced to a term of imprisonment of 97 months. Valencia appealed but the Second Circuit affirmed the conviction.

In July 2001, Valencia filed, *pro se*, a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. He argued that his guilty plea allocution was insufficient because he had admitted only that he had agreed with a confidential informant to engage in a narcotics transaction. He did not admit that he had conspired with anyone else. As discussed below, a defendant cannot be guilty of conspiracy to illegally distribute narcotics unless he conspires with someone other than a government agent or informant.

On December 13, 2001, without opposition from the Government, I granted the motion and vacated the conviction. Valencia was permitted to withdraw his guilty plea and the charge was reinstated. By then, Valencia had served some 53 months of his 97-month prison sentence. I released him on bail pending trial.

After pre-trial motions, Valencia waived his right to a jury. The case was tried to the Court, without a jury, on September 23 and 24, 2002. The issue whether Valencia conspired with anyone other than the confidential source continued to be the principal question in dispute. Indeed, the Government presented no evidence at trial as to the identity of any alleged co-conspirators, and the record showed that despite several hours of surveillance on each of two days, no law enforcement officer saw Valencia interacting with any one other than the informant. Nonetheless, for the reasons set forth below, I find that the Government has proven beyond a reasonable doubt that Valencia conspired with others—his suppliers—to distribute and possess with intent to distribute cocaine. Accordingly, a judgment of conviction will be entered against him finding him guilty on the sole count of the indictment.

Pursuant to Rule 23(c) of the Federal Rules of Criminal Procedure, my findings of fact and conclusions of law follow.

### STATEMENT OF THE CASE

#### A. The Facts

##### 1. The Confidential Source

On July 25, 1997, at approximately 1:30 p.m., FBI special agents Paul S. Dubbels

and Joseph M. Demarest, Jr. met with a confidential source (the "CS") in Brooklyn. The agents instructed the CS to page Valencia at a pager number they had for him. The CS and agents made two pages. First they inputted the CS's pager number along with the code "77–123." The number "77" identified the CS as the source of the page and "123" was intended to tell Valencia to respond quickly. The second page was made five minutes later and the numbers "77–3000" were inputted, "77" again identifying the CS and "3000" indicating that the CS was interested in purchasing 3,000 grams (or three kilos) of cocaine. (Trial Tr. 19–21).

Some 40 minutes later, the CS received a return page, with the inputted numbers: "23500–666." (*Id.* at 22). The code "666" identified Valencia as the source of the page and "23500" referred to the price that Valencia was going to charge for a kilo of cocaine—$23,500. (*Id.* at 59; *see also id.* at 74).

## 2. *The Telephone Conversations*

On July 28, 1997, the agents met with the CS again, at approximately 1 p.m. at FBI offices in Manhattan. During the meeting, the CS received a page with the numbers inputted "989–428–666." The agents recognized the "989–428" to be Valencia's pager number, with one digit missing. (*See* GX 31 (stipulating that Valencia's pager number, in July 1997, was 917–989–4328)). The agents and the CS then left FBI offices and found a public pay phone in the vicinity. The agents attached recording equipment to the pay phone and paged Valencia, entering the pay phone number as a call back number. Within a few minutes, the pay phone rang. It was Valencia and he and the CS had a conversation, which was recorded. (Trial Tr. at

22–26; GX 1T).[1] The following is an excerpt:

CS: Oh, What's up with the two?

RV [Raymond Valencia]: Whenever you're ready!

CS: But, you can't come to me?

RV: Nope.

CS: Why not?

RV: 'Cause I don't know. I can't. I don't travel. You know that'.

CS: You don't travel?

RV: I don't travel.

CS: Alright.

RV: *Si tu eres medio "federico"* [In case you're acting like a Fed.]

CS: [Laughs] Yo!

RV: Yeah?

CS: So, damn. Alright, so let me call this guy. 'Cause I got to get the paper from this guy. But this guy is gonna have to ... most likely I'm gonna come with the guy.' [U/I]

RV: No, but you come by yourself, bro. You know how we do it, bro.

(GX 1T).

After the conversation, Dubbels, Demarest, and other agents went with the CS to Queens. Approximately 3:12 p.m., the agents paged Valencia, inputting the CS's cell phone number as a call back number and also inputting "77–2000," to indicate that the CS was interested in purchasing two kilograms of cocaine. Approximately two minutes later, the CS received a telephone call on his cell phone from Valencia. The brief conversation between Valencia and the CS was recorded. The CS told Valencia that he was on 108th Street and Valencia expressed surprise that the CS was in Queens already without having given him more notice. Valencia told the CS:

1. Through counsel, Valencia has conceded that his voice is on the recordings of the eight telephone conversations received in evidence.

(Trial Tr. at 175–76). The parties also stipulated that GXs 1–8 are true and accurate recordings of the conversations. (GX 30).

"I'll meet you in front. I'm goin' right now. I'm like ten minutes away." (Trial Tr. at 29–31; GX 2T).

A few minutes later, Valencia paged the CS with a call back number. At 3:32 p.m., the CS called the number and the agents recorded the conversation between Valencia and the CS. The following is an excerpt:

RV: Where you at?

CS: 108 and 37th.

RV: Alright, check this out. Uh, I didn't think you were gonna come this early, so I'm not really ready yet. I just beeped my man. He's coming to my house. As soon as he gets here, I'm gonna page you. And it's gonna be lower . . .

CS: Oh, what's the price on it . . . oh, so how much?

RV: So, let me, let me see how it is, you know I'm gonna [U/I] . . .

(GX 3T).

The agents were waiting, prepared to make an arrest if the transaction could be consummated. The CS did not hear from Valencia, however, and thus the agents had him call Valencia at his residence at 4:14 p.m. (Trial Tr. at 34–35). Valencia and the CS had another conversation, which was recorded, a portion of which was as follows:

CS: What's up man? I gotta go . . .

RV: No, I just called to my man. Yeah. Twenty minutes he'll be here.

CS: In twenty minutes?

RV: Yeah.

CS: Alright, so you'll . . . anyway, I'll be there like in a little while.

RV: Nah, as soon as I beep you . . .

CS: O.K. When you beep me? Alright.

(GX 4T).

After more waiting and two more telephone conversations between the CS and Valencia, the agents went home, giving up for the day. In the two conversations, which were recorded, Valencia stated, in essence, that he was still waiting for his guy, who in turn was "waiting for his man to show up." (GX 6T; *see also* GX 5T).

Later that evening, the CS reported that he had had another telephone conversation with Valencia. The next morning, he reported that he had had yet another telephone conversation with Valencia. As a result, the agents decided the next day that it would be worthwhile to return to Queens with the CS. (Trial Tr. at 36–37, 58).

### 3. *The Arrest*

The next day, on July 29, 1997, the agents and the CS returned to Queens. At 1:36 p.m., the agents instructed the CS to contact Valencia. He did so and had a conversation with Valencia, which was recorded. The CS told Valencia that he "was gonna come by and check [Valencia] out." Valencia told him to come in forty-five minutes. (GX 7T).

At approximately 2:29 p.m., the agents directed the CS to try to contact Valencia again. They sent a page to Valencia, inputting "77—108—123," which was intended to tell Valencia that the CS was on 108th Street and that Valencia should respond quickly. At 2:42 p.m., Valencia paged the CS and the two had a brief telephone conversation. They arranged to meet "in about two minutes." (Trial Tr. at 39–40; GX 8T).

The CS then met with Valencia in Valencia's home. The CS eventually sent a prearranged signal that told the agents that Valencia was in possession of cocaine. (Trial Tr. at 40–41). As the meeting ended, Valencia and the CS left the building. At some point Valencia could see that a number of individuals—who turned out to be law enforcement—were approaching. He tried to escape on a motorcycle, but could not get it started. He then started to run. Agents and detectives caught him

and took him into custody. They found in his possession a knapsack that contained, as tests later revealed, approximately one kilo of cocaine, shaped as a brick and wrapped in yellow tape. (*Id.* at 42–43, 147–48; GXs 9, 10, 20, 32). The knapsack also contained a pager and cell phone. (GX 11).

#### 4. *The Post–Arrest Statements*

The agents took Valencia to FBI headquarters for processing. Valencia waived his rights and voluntarily gave the agents a statement. Valencia told the agents the following:

Valencia was in the gym earlier that day when a teenage Colombian male came to the gym and dropped off the cocaine, without saying anything. Valencia was going to deliver the cocaine to the CS. There were four suppliers who routinely used young Latino males to make deliveries. Valencia refused to give the names of the suppliers. He "was being charged" $22,000 by the suppliers for the cocaine and he had expected to sell it for $24,000 so that he would make a $2,000 profit. After meeting with the teenager in the gym, he returned to his residence to meet with the CS. At the meeting in his home, he met with the CS and provided him with a sample of the cocaine. As they left the building after the meeting, Valencia saw several people approaching and he thought he was going to be robbed; that was why he ran. (Trial Tr. at 47–49, 85–86).

Following his arrest, Valencia also consented to the search of his home. The agents recovered an organizer from his bedroom. The organizer contains several pages on which numbers were written, including "875 + 125," "7, 14, 125, 125," and "250" together with "4625." (Trial Tr. at 96–97, 101–03; GXs 14, 14R, 33). These numbers are consistent with numbers that are used in narcotics transactions, for

there are 1,000 grams in a kilogram and 28.5 grams in an ounce of cocaine (and approximately 7 grams in a quarter ounce and 14 grams in a half ounce). In 1997, $18,500 was the approximate wholesale price of a kilo of cocaine and 250 multiplied by 18.5 equals 4,625. (Trial Tr. at 102–03).

### B. *Prior Proceedings*

#### 1. *The Indictment*

The one-count indictment charges as follows:

1. From in or about January 1996, up to and including on or about July 29, 1997, in the Southern District of New York and elsewhere, RAYMOND VALENCIA, a/k/a "Panama," the defendant, and others known and unknown, unlawfully, intentionally, and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of said conspiracy that RAYMOND VALENCIA, a/k/a "Panama," the defendant, and others known and unknown, would distribute and possess with intent to distribute controlled substances, to wit 500 grams and more of mixtures and substances containing detectable amounts of cocaine, in violation of Sections 812, 841(a)(1) and 841(b)(1)(B) of Title 21, United States Code.

The indictment alleges certain overt acts, "among others," in furtherance of the conspiracy: the telephone conversations between Valencia and the CS on July 28 and 29, 1997.

 Hence, the indictment broadly charges a conspiracy, beginning in January 1996 and continuing through the date of Valencia's arrest, to distribute and possess with intent to distribute 500 grams and more of cocaine.[2] The indictment does not

---

**2.** The indictment does not charge Valencia

with engaging in a conspiracy specifically to

identify any of the alleged co-conspirators and identifies no specific overt acts other than the telephone conversations with the CS, who, as a matter of law, cannot be a co-conspirator.[3]

### 2. *The Guilty Plea*

On April 14, 1999, Valencia pled guilty before a magistrate judge. The magistrate judge questioned Valencia about what he had done:

Q. Could you please tell me in your own words what you did.

A. I engaged in the sale of one kilogram of cocaine, to a CI.

Q. Did you do that in an agreement or in connection with some other people as well?

A. Yes, your Honor, him.

Q. "Him" meaning the confidential informant, the CI you referred to?

A. Yes.

Q. When did this take place, approximately?

A. 1997—July 29, 1997.

Q. And where were you when you engaged in the sale of cocaine to the confidential informant?

A. 62–59 108th Street, Forest Hills, New York, apartment 2E.

(4/14/99 Tr. at 11). A colloquy ensued on the issue of venue and the magistrate judge confirmed that Valencia had had a telephone conversation with the CS about the sale of cocaine. Valencia stated that he did not know where the CS was calling from, but he eventually agreed to waive the issue of venue. (*Id.* at 11–13). The magistrate judge stated that he would recommend that I accept the plea of guilty. (*Id.* at 15). No questions were asked about the involvement of any other individuals, and the magistrate judge, the prosecutor assigned to the case at the time, and Valencia's then-attorney all failed to address the issue of whether Valencia could be guilty of conspiracy absent some indication that an individual other than the CS was involved.

### 3. *The Sentencing*

On October 27, 1999, the parties appeared for sentencing. I noted, incorrectly, that Valencia had pled guilty before me; in doing so, I relied on the presentence report, which incorrectly stated that Valencia had pled guilty before me. As a consequence, I never reviewed the transcript of the plea allocution before the magistrate judge and I never considered the magistrate judge's recommendation that I accept the guilty plea. Because certain factual disputes arose, I adjourned the sentencing for an evidentiary hearing.

---

sell cocaine to the CS. Rather, it charges a more general conspiracy, alleging that Valencia conspired with "others known and unknown" to distribute cocaine. It charges the telephone conversations with the CS as overt acts, but it alleges that these overt acts are "among others" in furtherance of the conspiracy. The "object" of the conspiracy is described as the distribution and possession with intent to distribute controlled substances generally, without reference to the transaction with the CS.

**3.** The evidence at trial showed narcotics activity only from July 25 through July 29, 1997, or just five days out of the nineteen months charged in the indictment. Nonetheless, all the Government need do is prove that the conspiracy fell within the period charged. *United States v. Heimann,* 705 F.2d 662, 666–67 (2d Cir.1983); *see also United States v. Queen,* 132 F.3d 991, 999 (4th Cir.1997) ("the trier of fact may find that the starting date of a conspiracy begins anytime in the time window alleged, so long as the time frame alleged places the defendant sufficiently on notice of the acts with which he is charged"). Even assuming there is a variance between the indictment and the proof, the variance is not significant unless it affects a defendant's substantial rights. Fed. R. Cr. P. 52(a); *Heimann,* 705 F.2d at 668–69.

The hearing was held on November 17, 1999. At the conclusion of the hearing, after I ruled on the factual and legal issues, I sentenced Valencia to a term of imprisonment of 97 months.

### 4. *The Post–Conviction Proceedings*

Valencia appealed. He apparently did not raise on appeal the issue whether his plea allocution was sufficient in light of his admission only to conspiring with the CS. On November 9, 2000, the Second Circuit affirmed.

On July 11, 2001, Valencia filed, *pro se*, a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence, raising the issue of the sufficiency of his plea allocution. On November 6, 2001, after reviewing the petition and the Government's response thereto, I issued an order noting that "it appears that [Valencia] raises what may be a meritorious issue," citing *Montgomery v. United States*, 853 F.2d 83, 85 (2d Cir.1988) (to be guilty of conspiracy to sell narcotics, defendant "must have conspired with someone other than a government agent or an informant"). *See also United States v. Andrades*, 169 F.3d 131, 135 (2d Cir.1999) ("to show a conspiracy, the government must establish the fact of a criminal agreement among individuals who are neither government agents nor confidential informants"). I appointed counsel for Valencia, but thereafter he retained his current attorney.

At a conference on December 13, 2001, the Government advised the Court that it would not oppose Valencia's petition to vacate his conviction and set aside his guilty plea. (12/13/01 Tr. at 2). Accordingly, I granted the motion, vacated the conviction, and permitted Valencia to withdraw his guilty plea. The charge in the indictment was reinstated. (*Id.*).

### 5. *Defendant's Motions*

Thereafter Valencia made three motions. The first was to dismiss the indictment on the basis that the Government had not made a sufficient showing of the existence of a conspiracy involving Valencia and anyone other than the CS. I denied the motion from the bench, holding that the indictment was sufficient on its face and that the Government was entitled to present its proof at trial.

The second was a motion to dismiss the indictment for lack of venue. Valencia argued that all of the key facts took place in Queens and thus the case was not properly in the Southern District of New York. I denied the motion on the grounds that Valencia had made a phone call to the CS in the Southern District of New York, that the phone call was an overt act in furtherance of the conspiracy, and that, according to Second Circuit case law, venue was properly in this Court, even though the phone call was to the CS. *See United States v. Naranjo*, 14 F.3d 145, 146–47 (2d Cir.1994) (holding that phone call from co-conspirator in Queens to undercover FBI agent in Manhattan in furtherance of conspiracy was sufficient basis for venue in Southern District of New York as to defendant, who was a member of the conspiracy); *see also United States v. Smith*, 198 F.3d 377, 382 (2d Cir.1999) (holding that "phone calls from one district to another by themselves can establish venue in either district as long as the calls further the conspiracy").

Finally, shortly before trial was to commence, pursuant to Fed.R.Crim.P. 23(a), Valencia sought to waive his right to a jury trial. The Government consented to the waiver and I granted Valencia's request to waive his right to a jury. The case was tried to the Court, without a jury, on September 23 and 24, 2002.

## DISCUSSION

Valencia concedes that he negotiated to sell cocaine to the CS and that he was arrested with cocaine in his possession. He argues, however, that the Government failed to prove that he conspired with anyone other than the CS, and notes that the Government charged him only with conspiracy and not with simple possession. He also relies on the "buyer-seller" rule, which provides, as discussed below, that the mere purchase and sale of narcotics, without more, does not constitute a conspiracy to distribute narcotics.

### A. *Applicable Law*

#### 1. *Conspiracy*

■■ The essence of the crime of conspiracy is "the agreement of two or more persons to commit a criminal act." *United States v. Gore,* 154 F.3d 34, 40 (2d Cir. 1998). To prove the existence of a conspiracy, the Government must show that "at least two culpable co-conspirators" agreed "to participate in a joint venture intended to commit an unlawful act." *United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.1997). The Government must prove that the defendant knew of the existence of the conspiracy and knowingly joined and participated in it. *Gore,* 154 F.3d at 40 (citing *United States v. Sanchez Solis,* 882 F.2d 693, 696 (2d Cir.1989)).

■ A defendant can be guilty of conspiracy without knowing the identities of the co-conspirators. *Blumenthal v. United States,* 332 U.S. 539, 557–58, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *see also United States v. Cordero,* 668 F.2d 32, 42 (1st Cir.1982) ("Indeed, the courts have held that a single agreement[,] and hence a single conspiracy, may exist even when parties do not know the identity of one another and are not aware of all the details of a plan of operation.") (Breyer, J.). The Second Circuit has cautioned, however, that "the evidence must at least demon-strate the existence of the unknown co-conspirators and their complicity." *Gore,* 154 F.3d at 41; *see also United States v. Cepeda,* 768 F.2d 1515, 1517 (2d Cir.1985) (defendant's intent to join narcotics distribution conspiracy could not be inferred from mere presence and possession of drug cutting paraphernalia).

#### 2. *The "Buyer–Seller" Rule*

■ A conspiracy to distribute narcotics does not arise just because there is a narcotics transaction, for the mere purchase and sale of drugs does not, without more, amount to a conspiracy to distribute narcotics. *See, e.g. United States v. Mims,* 92 F.3d 461, 465 (7th Cir.1996) (buyer-seller relationship insufficient to show conspiracy "even when the buyer intends to resell the purchased narcotics"); *United States v. Medina,* 944 F.2d 60, 65 (2d Cir.1991) ("in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy"). As the Tenth Circuit has explained:

> [T]he purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy.

*United States v. Ivy,* 83 F.3d 1266, 1285–86 (10th Cir.1996).

■ The circumstances are different, however, when wholesale quantities are involved. The Second Circuit has "frequently noted that 'one who deals in large quantities of narcotics may be presumed to know that he is a part of a venture which extends beyond his individual participation.'" *United States v. Murray,* 618 F.2d 892, 902 (2d Cir.1980) (*quoting United States v. Magnano,* 543 F.2d 431, 433–

34 (2d Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977)). At one end of the conspiracy, the manufacturers or importers make or otherwise obtain the narcotics; they then supply large quantities of the narcotics to their customers, the wholesale distributors, who in turn sell to the retailers at the other end of the conspiracy for sale to the consumers or end-users. *See United States v. Mallah,* 503 F.2d 971, 984 (2d Cir.1974) (describing "the usual chain conspiracy encountered in drug cases"). Even though there may be separate purchases along each link of the chain, the different members of the conspiracy have a common purpose: to sell more drugs. If the retailers sell more drugs to consumers, the retailers will then buy more from the wholesalers, who in turn will buy more drugs from the manufacturers/importers.

### B. *Application*

Two issues are presented: (1) whether the Government proved, beyond a reasonable doubt, that Valencia conspired with someone other than the CS; and (2) whether Valencia is protected by the buyer-seller rule. I address each issue in turn.

#### 1. *The Conspiracy*

■ The principal issue is whether the Government has proven, beyond a reasonable doubt, that Valencia conspired with individuals other than the CS to illegally distribute cocaine. I conclude that the Government has met its burden, for the following reasons:

First, after negotiating to sell two or three kilos of cocaine to the CS and telling the CS he was getting cocaine from someone else, Valencia in fact produced a kilo of cocaine. Valencia's ability to come up with a distribution (and not just personal use)

quantity of cocaine is strong evidence that he was working with a supplier.[4]

Second, in his conversations with the CS, Valencia referred numerous times to a person who was supposed to be bringing him the cocaine. He refers to "my man." (GX 3T, 4T). He refers to conversations he had with the person. (GX 6T ("I just spoke to him and he just, he just already standing on the corner waiting for his man to show up."); 5T ("He told me to wait, man.")). He refers to beeping him to "find out what's going on." (GX 5T; *see also* GX 3T). The conversations provide concrete evidence that Valencia was working with someone else.

Third, Valencia made the CS wait, several hours the first day, then overnight, and then again for a period of time the second day. The CS appeared to sound anxious and impatient and at one point he even talked about going somewhere else. If Valencia was not actually waiting for a supplier to deliver the cocaine to him and he had the cocaine readily available on his own, he would have undoubtedly just given the CS the cocaine rather than risk losing the sale by making the CS wait.

Fourth, in his post-arrest statement Valencia told the agents and detectives that he was working with four suppliers, who used young teenagers to deliver the drugs. He explained that he was selling the cocaine at a higher price than he was paying the suppliers so that he would make a profit. Hence, after he was arrested he confirmed that he was working with someone.

Valencia argues that the Government has failed to meet its burden of proof because there is a reasonable doubt as to whether he was working alone. Valencia argues, in substance, that his conversa-

---

**4.** It is theoretically possible that Valencia already had the cocaine on hand, but in light of all the evidence in the record, I do not believe that this is a reasonable possibility.

tions with the CS and his post-arrest statements are unworthy of belief (or do not rise to proof beyond a reasonable doubt), pointing to certain inconsistencies between what he said to the CS and what he told the agents and detectives. If his conversations and statements are taken out of the mixture, he contends, the record would contain no evidence that anyone else was involved. (*See* Trial Tr. at 179–83).

 It is true that the most damaging evidence against Valencia consists of his own words—the tape-recorded conversations and his statements to the arresting officers. The Government has not presented any evidence of who the suppliers were, nor does the record contain any direct evidence—other than Valencia's words—that anyone else was involved. None of the agents or detectives, for example, saw anyone deliver the cocaine to Valencia. But the Government was not required to prove the identities of the co-conspirators, and notwithstanding the inconsistencies in Valencia's statements, I reject the argument that his conversations and statements were a complete fabrication. Although Valencia was not fully honest with either the CS or the agents and detectives, he had no conceivable reason to lie about the existence of his suppliers, either to the CS during the telephone conversations or to the agents in his post arrest statement. His conversations and statements and the other evidence in the case prove, beyond a reasonable doubt, that he was working with one or more suppliers.

### 2. *The Buyer–Seller Rule*

 Valencia also argues that, at most, the Government proved a single transaction involving the purchase and sale of narcotics and that it failed to prove a conspiratorial agreement to distribute narcotics. He argues that if the Government's position that a conspiracy was prov-

en in this case is accepted, every purchase and sale of distribution quantities of drugs would involve a conspiracy. These arguments are rejected, for Valencia's reliance on the buyer-seller rule is misplaced.

First, Valencia was negotiating to sell two or three kilos of cocaine and was found in possession of approximately one kilo. These are not personal use quantities and surely the suppliers involved knew that Valencia was going to further distribute the cocaine. They knew, based on the quantity alone, that Valencia was not purchasing the cocaine for personal use.

Second, the record contains substantial evidence, in addition to the quantity of cocaine involved, to show that Valencia and his suppliers were engaging in concerted action—that they were working together. Valencia told the agents after he was arrested that he "was being charged" $22,000 for the kilo and that he expected to make a profit of $2,000. The language suggests, and I so find based on all the circumstances, that Valencia was going to pay for the cocaine from the monies he expected to receive from the CS. In other words, the cocaine was delivered to Valencia on consignment and both he and his suppliers had a vested interest in his ability to obtain payment for the cocaine from his buyer. Indeed, this was joint action, for if Valencia did well and sold more cocaine, his suppliers in turn would also do well as they would also sell more cocaine. The suppliers were willing to give Valencia a discount so that he could make a profit because he took a greater risk—he was the one dealing with the buyers such as the CS.

Third, the record contains substantial evidence to show that this was not a one-time transaction for Valencia but that, to the contrary, he was involved in an ongoing effort to distribute cocaine. The taped conversations show that Valencia was in

communication with a supplier with whom he had an ongoing relationship. In one of the conversations, for example, Valencia told the CS: "I just beeped my man. He's coming to my house." The fact that the person delivering the cocaine was going to meet Valencia at his home suggests Valencia knew him well. Valencia also knew that the suppliers regularly used teenage boys to deliver the drugs. He also showed, both in the coded beeper messages and in the telephone conversations, that he was familiar with the narcotics trade. He said to the CS: "but you come by yourself, bro. You know how we do it, bro."

Valencia relies heavily on *United States v. Gore.* There, the defendant was convicted of participating in a heroin conspiracy. The sole evidence at trial of his involvement in the conspiracy consisted of his sale of $45 worth of "Fuji Power" heroin (0.11 grams) to a confidential informant and his statement to the informant that: "I don't want to lose face with that dude man because he always has something decent and he always comes up right. Never tapped, never in a bag, never messed up, yeah so I should do him right." 154 F.3d at 38. The Government argued that because the defendant sold heroin under the label "Fuji Power," a widely sold brand in the Albany area, and the defendant made specific reference to a supplier with whom the defendant did not want to "lose face," the defendant must have had a supplier and must have been part of the "Fuji Power" narcotics conspiracy. The jury convicted.

On appeal, however, the Second Circuit reversed. The court held that "the mere buyer-seller relationship" between the defendant and the CS was insufficient to establish a conspiracy. Although the court acknowledged that the "losing face" remark could "indicate" that the defendant had a buyer-seller relationship with another person who was a source for his drugs, the court held that the evidence was insufficient to show "a conspiratorial agreement to distribute drugs made between [the defendant] and that unknown source." *Id.* at 40.

This case is distinguishable. The defendant in *Gore* sold barely more than a tenth of a gram of heroin, while Valencia was involved in the sale of a kilo of cocaine, and he had been negotiating to sell even more. The defendant in *Gore* made a single, casual comment to the confidential informant about "losing face" with an apparent supplier, but the comment showed only that the defendant purchased drugs from the supplier. On its face, the comment did not prove anything more than a mere buyer-seller relationship between the defendant and his supplier, for there was nothing in the record to suggest that the supplier knew that the defendant in turn would sell to anyone else. In contrast, Valencia had repeated conversations with the CS in which he referred to repeated communications he was having with his supplier (or the supplier's representative) to obtain the cocaine that he was planning to sell to the CS. Valencia's comments show more than a mere buyer-seller relationship with his suppliers; they show concerted action. The fact that Valencia and his suppliers engaged in concerted action made it more likely that they would succeed in their criminal enterprise. As the Supreme Court has held:

> [C]ollective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality.

*Callanan v. United States,* 364 U.S. 587, 593, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961)

(*quoted in United States v. Bicaksiz,* 194 F.3d 390, 395 (2d Cir.1999)).

### CONCLUSION

For the reasons set forth above, I find the defendant Raymond Valencia guilty on the sole charge against him, conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B). I find further that the conspiracy involved more than 500 grams of cocaine. Judgment will be entered accordingly.

SO ORDERED.