**UNITED STATES of America,**

v.

**Jack DAVIS, Defendant.**

**No. CRIM.A. 03–348(RWR).**

United States District Court,
District of Columbia.

Nov. 22, 2005.

## MEMORANDUM OPINION AND ORDER

ROBERTS, District Judge.

On November 1, 2004, Jack Davis was convicted after a jury trial of a narcotics conspiracy, possession of marijuana, possession with intent to distribute phencyclidine ("PCP"), firearm possession during a drug trafficking offense, and unlawful distribution of cocaine.[1] Davis moved for judgment of acquittal, challenging the sufficiency of evidence and the propriety of pretrial rulings allowing the admission of certain evidence. He also moved for a new trial alleging a violation of the Jencks Act, 18 U.S.C. § 3500 (2000), and for a court order permitting him to interview the jurors.[2]

The defendant's motion for judgment of acquittal will be denied. The evidence when viewed in the light most favorable to the government permitted a reasonable jury to find the essential elements of a conspiracy to distribute PCP, and the government was not required to establish that the charged conspiracy existed during the exact dates mentioned in the indictment. An FBI agent's trial testimony was not significantly inconsistent with his testimony at the pretrial suppression hearing or with another agent's trial testimony, and neither an order vacating the denial of the pre-trial suppression motion nor a judgment of acquittal is warranted. Moreover, the government properly introduced the defendant's acquitted conduct as evidence of conduct in furtherance of the conspiracy and not as character evidence.

No willful or negligent Jencks violation that warrants a new trial has been established. Because no judicial inquiry is permitted into the jury's deliberative process, and because the defendant has failed to show good cause or reasonable grounds for interviewing jury members, the defendant's motion to interview the jurors will be denied.

## BACKGROUND

Davis was driving a Lincoln Navigator on December 17, 2001. FBI Special

1. The superseding indictment on which the defendant was tried charged six offenses: conspiracy between 1993 and 2003 to possess with intent to distribute cocaine, crack cocaine, PCP, and marijuana, in violation of 21 U.S.C. § 846 (Count One); possession of marijuana, in violation of 21 U.S.C. § 844(a) (Count Two); possession with intent to distribute PCP, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count Three); using, carrying, and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1) (Count Four); unlawful possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k) (Count Five); and unlawful distribution of cocaine, 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count 6). The defendant was acquitted of Count Five.

2. Although the docket indicates that the defendant's motion was filed on November 12, 2004, a date-stamped copy of his original motion shows that it was filed on November 10, 2004, within the seven-day time period allowed under Federal Rules of Criminal Procedure 33(b)(2) and 45(a).

Agents Kyle Fulmer and Robert Lockhart stopped Davis for failing to come to a complete stop at a stop sign. (Mot. Tr. 3/18/04 at 34, 38–45.) The agents searched the Navigator and found in it marijuana, PCP, and a weapon. Before trial, Davis moved to suppress the evidence recovered during the traffic stop, alleging that the stop was illegal and that the fruits of the resulting search and seizure should be suppressed. (Mot. Tr. 3/18/04 at 166.) The court credited Fulmer's testimony that Davis' vehicle failed to come to a full stop at a stop sign, found that the agents had conducted a lawful traffic stop, and denied the defendant's motion. (Mot. Tr. 3/18/04 at 173–74.) At trial, when Fulmer was questioned about the traffic stop, Fulmer first stated that the defendant stopped his vehicle before trying to make a U-turn. When asked to clarify, Fulmer explained that he called a rolling stop a stop, even though it is not a full stop. Fulmer maintained that because the defendant came to only a rolling stop and not a full stop, the defendant had committed a traffic violation. (Trial Tr. 10/21/04 a.m. at 114–16.)

Before trial, Davis also filed a motion in limine seeking to restrict the introduction of any evidence implicating him in the murder of David Scott on the ground that Davis had been acquitted of that murder charge. (Corrected Mot. in Limine [# 180].) The conspiracy count alleged that in furtherance of the conspiracy, Davis and his co-conspirators used firearms and committed acts of violence, including murder, against anyone who disrupted or threatened to disrupt the conspiracy or in retaliation for violence committed against members of the con-

spiracy. The motion in limine was denied on the ground that the murder evidence was intertwined with, and direct evidence of, the crimes being charged.

At trial, the government called as witnesses Fulmer, Lockhart, former FBI police officer Warren Hills, and a number of the defendant's alleged co-conspirators and cooperating witnesses including Michael Henderson, Rodney Robertson, Robert Crawford, Paul Tyler, Thomas Davis, Keith Harrison, Marcus Robertson, and Cedric Conner. The testimony revealed that Thomas Davis introduced the defendant to a woman known as "Pinky," that the defendant stored PCP and Thomas Davis stored crack cocaine in Pinky's house, that both Davises sold these drugs from there, and that the defendant supplied Pinky with "dippers" of PCP. (Trial Tr. 10/19/04 p.m. at 101–05; Trial Tr. 10/20/04 a.m. at 9.) Pinky was a willing participant in this arrangement. (Trial Tr. 10/19/04 p.m. at 104.) During an interval from 1993 to 1996, the defendant and his twin brother James Davis were also involved in selling marijuana with Keith Harrison.[3] (Trial Tr. 10/13/04 a.m. at 78.) During roughly the same time, the defendant agreed to supply Thomas Davis with drugs to sell (Trial Tr. 10/19/04 p.m. at 78, 94–96), the defendant sold Thomas Davis cocaine (Trial Tr. 10/19/04 p.m. at 104; Trial Tr. 10/20/04 a.m. at 63–65), and the defendant and his brother James sold either marijuana or crack cocaine. (Trial Tr. 10/20/04 a.m. at 81–85.)

Henderson testified that the defendant shot and killed a man known as "Head." (Trial Tr. 10/7/04 p.m. at 13–15.) Harrison

---

**3.** The defendant suggests that Keith Harrison contradicted this testimony by later testifying that "he did not start dealing with [the defendant and James Davis] until late 2000, early 2001, which was his FIRST time dealing with [them]." (Def.'s Reply to Gov.'s Combined Opp'n to Def.'s Omnibus Mot. for J. of Acquittal, for New Trial, and for Ct. Order Permitting Def. to Interview Jurors ("Def.'s Reply") at 2.) That latter testimony, however, referred to his cocaine, and not marijuana, transactions. (Trial Tr. 10/13/04 p.m. at 49–50.)

said the murder occurred in 1996. (Trial Tr. 10/13/04 a.m. at 83.) Henderson and Thomas Davis testified that Head was killed because Head robbed the defendant's brother James and the defendant wanted revenge. (Trial Tr. 10/7/04 p.m. at 13–15; Trial Tr. 10/19/04 p.m. at 86–87.) Thomas Davis and Richardson said that the defendant was acquitted of Head's murder. (Trial Tr. 10/19/04 p.m. at 86–87; Trial Tr. 10/21/04 a.m. at 66.)

Hills testified that the defendant visited the FBI field office on December 18, 2001 and asked for the return of the vehicle, earrings and belt that the agents had confiscated upon his arrest after being stopped for making a U-turn. (Trial Tr. 10/18/04 p.m. at 24–25, 29, 33.) Hills said the defendant mentioned owning a gun. (*Id.* at 25, 36–38.) However, Hills denied two details Fulmer apparently wrote in his summary of his interview of Hills, namely, that the defendant described the U-turn as "illegal" and the agents had taken a gun from the vehicle. (*Id.* at 36–38.) Hills mentioned that he had prepared a handwritten statement detailing the defendant's visit to the FBI office and had given the statement to an agent whom Hills could not identify by name. (Trial Tr. 10/18/04 p.m. at 34.) In a bench conference, defense counsel sought production of a copy of Hills's written statement, and stated that the Assistant United States Attorney ("AUSA") did not recall having received a copy. (*Id.* at 36.) In confirming that, the AUSA stated that he would try to determine if such a statement existed, and if so, would make Hills available for further cross-examination. (*Id.* at 36.)

During the deliberations, the jury sent out a note "request[ing] a definition of the common terms for weight/quantities of powdered and crack cocaine, PCP, marijuana." (Trial Tr. 10/27/04 a.m. at 14–15.) The court's written response read: "Dear

jurors, I am not certain that I know exactly what you are asking for. May I ask you to give me a bit more detail in your question so that I may try to answer you." (Trial Tr. 10/27/04 a.m. at 18–19.) The jury responded the following morning with another note stating that they "would like weights in grams of street terms such as 62s, 31s, eightballs, dime bags, quarters, etcetera, as a definition of these terms in grams." (Trial Tr. 10/28/04 a.m. at 2–3.) The court's written response was: "Dear jurors, Thank you for clarifying yesterday's question concerning definitions of weights . . . . You must rely entirely upon your memory of the testimony and other evidence, and your notes if you took any, concerning definitions of weights." (*Id.* at 4–5.) Both parties agreed that this answer was satisfactory. (*Id.* at 5.) The jury later sent out a note asking whether it must find all elements of Count Five before it could find the defendant guilty on that count. (*See* Trial Tr. 11/1/04 p.m. at 5.) Defense counsel argued that the court should respond that finding all elements on *all* counts was necessary. The court instead responded that to convict on Count Five, the jury must find all elements of that count, but noted the defendant's objection. (Trial Tr. 11/1/04 p.m. at 23.)

The defendant filed an omnibus posttrial motion. He seeks a judgment of acquittal arguing that the government presented insufficient evidence to establish a conspiracy during the times alleged, and arguing that the court should reconsider and reverse its rulings denying the suppression motion and allowing the government to present evidence of the defendant's acquitted conduct. He also seeks a new trial, claiming that the government failed to provide Hills's Jencks statement. The defendant also asks for a court order permitting him to interview the jurors to determine whether the jurors relied on extra-record data and whether the jurors

found all elements of all the counts before finding the defendant guilty. (Def.'s Am. Omnibus Mot. for J. of Acquittal, Mot. for New Trial, Mot. for Ct. Order and Incorporated Mem. of Law in Supp. ("Def.'s Am. Mot.") at 1, 8–14.)

## DISCUSSION

### I. MOTION FOR JUDGMENT OF ACQUITTAL

 Under Rule 29(c) of the Federal Rules of Criminal Procedure, a defendant may renew a motion for judgment of acquittal after a guilty verdict has been returned. Fed.R.Crim.P. 29(c). A judgment of acquittal is warranted "only when there is no evidence upon which a reasonable mind might find guilt beyond a reasonable doubt." *United States v. Hernandez,* 780 F.2d 113, 120 (D.C.Cir.1986). The court "must view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Campbell,* 702 F.2d 262, 264 (D.C.Cir.1983).

#### A. *Narcotics conspiracy*

The defendant argues that the evidence at trial was insufficient to convict him for conspiracy to possess with intent to distribute cocaine, crack, PCP, and marijuana between 1993 and 2003. (Def.'s Am. Mot. at 8.) Specifically, the defendant contends that (1) the government presented no evidence of a conspiracy to distribute PCP between 1993 and 2003, and (2) the evidence did not suggest any drug activity between the defendant and the witnesses from 1993 to 1998. (*Id.* at 8–9.)

#### 1. Conspiracy to distribute PCP

 To establish a conspiracy in violation of § 846, the government must show an agreement or mutual understanding between at least two people to violate narcotics laws, and knowing and intentional participation in the conspiracy. *See United States v. Hines,* 398 F.3d 713, 718 (6th Cir.2005), *cert. denied sub nom. Edwards v. United States,* ─── U.S. ───, 125 S.Ct. 2592, 162 L.Ed.2d 878 (2005).

 The government's evidence was that Thomas Davis used Pinky's Fourth Street apartment to store and sell crack cocaine. Thomas Davis introduced the defendant to Pinky, and Pinky allowed the defendant to store his PCP in her apartment and sell PCP to others from her apartment in exchange for PCP. When viewed in the light most favorable to the verdict, this evidence alone was sufficient for a jury to conclude that the defendant was involved in an ongoing conspiracy to distribute PCP.

#### 2. Evidence of a conspiracy between 1993 and 1998

 The government is not required to prove that a conspiracy began and ended on the exact dates mentioned in the indictment. *United States v. Queen,* 132 F.3d 991, 999 (4th Cir.1997); *United States v. Heimann,* 705 F.2d 662, 666 (2d Cir.1983) ("Particularly with respect to allegations of time, [the court has] permitted proof to vary from the indictment provided that the proof fell within the period charged."); *United States v. Postma,* 242 F.2d 488, 497 (2d Cir.1957) (finding that even though the proof at trial showed a conspiracy starting only in 1952 when the indictment alleged that it began in 1951, "it does not follow that there was a fatal variance [because] the conspiracy proved fell within the period charged"); *see also United States v. Valencia,* 226 F.Supp.2d 503, 508 n. 3 (S.D.N.Y.2002) ("[A]ll the Government need do is prove that the conspiracy fell

within the period charged."). "[T]he trier of fact may find that the starting date of a conspiracy begins anytime in the time window alleged, so long as the time frame alleged places the defendant sufficiently on notice of the acts with which he is charged." *Queen,* 132 F.3d at 999 (holding that "the specificity of the indictment's allegations" sufficiently put the defendant on notice of the charged crime and "the date of the conspiracy was not a substantive element of the crime of conspiracy"). Because the indictment charged a conspiracy between 1993 and 2003 (Def.'s Am. Mot. at 9), and since the government needed to prove only that the conspiracy occurred within the time window alleged, a lack of evidence of a narcotics conspiracy between 1993 and 1998 is not a ground for judgment of acquittal. *Heimann,* 705 F.2d at 666.

In any event, the government's evidence showed that the defendant sold marijuana from 1993 to 1996 with James Davis and Keith Harrison. Government witnesses also revealed that during this time, the defendant conspired with Thomas Davis to sell drugs, sold Thomas Davis cocaine, and sold either marijuana or crack cocaine with James Davis. The government did produce evidence that a conspiracy existed during the time frame alleged.

### B. *Narcotics and gun convictions*

The defendant argues that the evidence was insufficient to convict him of Counts Two through Four and Count Six alleging possession of marijuana; possession with intent to distribute PCP; using, carrying, and possessing a firearm during a drug trafficking offense; and unlawful distribution of cocaine, respectively. (*See* Def.'s

Am. Mot. at 9.) Specifically, he contends that the court should reverse its prior denial of his motion to suppress, and that suppression of the evidence would warrant a judgment of acquittal on those counts. He bases his request for reversal on claimed differences between Fulmer's testimony at the suppression hearing and his testimony at trial, and between Fulmer's and Lockhart's testimony at trial.[4] (*Id.* at 9.) The defendant cites no authority for the proposition that a post-conviction judgment of acquittal would be the proper remedy should a court reconsider the denial of a motion to suppress evidence. The defendant's argument appears to be more properly the subject of either a motion for reconsideration of the motion to suppress or of a motion for a new trial. *See United States v. Broomfield,* 201 F.3d 1270, 1273 (10th Cir.2000) (affirming the district court's order that denied defendant's motion to suppress seized evidence, and denying defendant's request for a new trial without the seized evidence); *Rouse v. United States,* 359 F.2d 1014, 1016 (D.C.Cir.1966) (remanding for fresh determination of the suppression motion and stating that a new trial would be ordered if suppression was granted). *But see United States v. Jennings,* 235 F.Supp. 551, 552–54 (D.D.C.1964) (denying the defendant's motion for judgment of acquittal based on illegally seized evidence because the court found that the Commissioner had a substantial basis for issuing a search warrant).

■ A pre-trial ruling on a motion to suppress does not bind the trial judge in all circumstances. *Rouse v. United States,* 359 F.2d 1014, 1015–16 (D.C.Cir.1966). When new facts shed new light on the credibility of government witnesses and

4. Counts Two, Three, and Four stemmed from the traffic stop of the defendant by Fulmer and Lockhart on December 17, 2001. The defendant does not present any basis for suppressing the evidence related to the cocaine distribution on November 22, 2002 charged in Count Six.

reasonable doubt is cast on the pre-trial decision, it then becomes the duty of the trial judge to reconsider the issue of suppression de novo. *Id.* at 1016. Where major inconsistencies in the police testimony surface both at the suppression hearing and at trial, the trial court should conduct a "fresh determination of the suppression issue." *Id.; see Jackson v. United States,* 353 F.2d 862, 867 (D.C.Cir.1965) (holding that where an officer's testimony is internally contradictory and is "contrary to the human experience," that officer's testimony can be discredited and the suppression decision reversed).

In *Rouse,* the suppression hearing testimony of two police officers who arrested the defendant was inconsistent. 359 F.2d at 1015. The police officers disagreed as to who was driving the police cruiser when the defendant was found, how far away the defendant was when they spotted him (one stated that he was "just a short distance" away from R street, while the other stated that the defendant was not anywhere near R street), and in which direction the officers followed the defendant. *Id.* The judge denied the motion to suppress, but expressed concern regarding the numerous inconsistencies that he stated were not slight or immaterial, and reserved the appellant's right to renew the motion at trial. *Id.* At trial, one of the officers changed his testimony significantly to correspond almost identically with the other officer's testimony. *See id.* When the officer was questioned about the inconsistencies between his testimony at the suppression hearing and at trial, the officer stated that he had confused the facts of the defendant's case with those in another case. *Id.* When the defendant moved again for the material to be suppressed, the trial judge credited the suppression judge's decision and denied the motion to reconsider. *Id.* On appeal, the D.C. Circuit found that the officer's explanation for the inconsistency

in his testimony "stirred previous doubts and raised new ones" and "reasonably required inquiry and a fresh determination of the suppression issue." *Id.* at 1016 (remanding the case for fresh determination of the suppression issue, and stating that if suppression was granted, a new trial would be ordered). *Id.* at 1016.

Where testimonial inconsistencies are minor, however, the district court has discretion to suppress based on its "unique position to gauge [the witness's] credibility" when observing the demeanor of the witness. *United States v. Valentine,* 401 F.3d 609, 614 (5th Cir.2005). Testimony is not always suspiciously inconsistent when the differences are insignificant. *See United States v. Fryer,* 974 F.2d 813, 818 (7th Cir.1992) (finding that the officer's testimony was not significantly inconsistent when he first testified that he stopped the defendant for turning right at an intersection where that is not allowed, and later that he stopped the defendant for turning right without first stopping).

■ Here, Fulmer's trial testimony is not significantly inconsistent with his testimony at the suppression hearing. At the suppression hearing, Fulmer testified that the defendant did not come to a full stop at the stop sign. (Mot. Tr. at 39.) At trial, although Fulmer stated that the defendant stopped before making the U-turn, he qualified that statement by explaining that he refers to a "rolling stop" as a stop, but that the defendant did not come to a full stop. (Trial Tr. 10/21/04 a.m. at 117.) Fulmer never testified at either the trial or the suppression hearing that the defendant came to a complete stop at the stop sign. This inconsistency was only a minor one. *See Valentine,* 401 F.3d at 612; *Fryer,* 974 F.2d at 818–19; *cf. Rouse,* 359 F.2d at 1015 (finding multiple inconsistencies between the two police officers' testimonies

at the suppression hearing, as well as between the suppression hearing and trial).

The defendant also alleges that Lockhart's testimony was inconsistent with Fulmer's testimony because at trial, Lockhart testified that the decision to stop the defendant was made after the defendant failed to stop at a stop sign, made an illegal U-turn, and almost collided with their unmarked police vehicle. (Trial Tr. 10/18/04 a.m. at 49.) Both Lockhart and Fulmer justified pulling over the defendant's vehicle based in part on the defendant's failure to stop at a stop sign. (*Id.*) Lockhart's rendition of events would not have changed the court's pretrial disposition of the suppression motion. Thus, no reconsideration of the motion to suppress is warranted.

### C. *Government's use of acquitted conduct*

Finally, the defendant seeks reversal of the denial of the defendant's motion in limine regarding the defendant's acquitted conduct. (Def.'s Am. Mot. at 14.) The defendant appears to be arguing that although the court admitted as being intrinsic to the crimes charged here evidence of the murder of which defendant was acquit-

ted, its admission "substantially prejudice[d] the defendant in the eyes of the jury." (*Id.*) The defendant also claims that the government is now trying to justify admission of this evidence under Federal Rule of Evidence 404(b)[5], which would have required giving the jury a cautionary instruction about the limited role that this evidence should play.[6] (Def.'s Am. Supplemental Argument at 1–2.) Although it is unclear from his post-trial briefs, it seems that the defendant is also arguing that no evidence indicates that the alleged conspiracy and the murder were related.[7] (Def.'s Am. Mot. at 2.)

■■■■ Where the government offers evidence of an incident that is part of the conspiracy alleged in the indictment, it is not an "other crime" which would be subject to Rule 404(b) and require a cautionary jury instruction. *United States v. Badru*, 97 F.3d 1471, 1474 (D.C.Cir.1996); *United States v. Gray*, 292 F.Supp.2d 71, 79 (D.D.C.2003). Rather, "[t]he evidence is offered as direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused." *Badru*, 97 F.3d at 1475 (citing 23 Wright & Graham, *Fed. Practice and Procedure* § 5329 at 450 (1978)). Evi-

5. Rule 404(b) states in part that "[e]vidence of other crimes ... is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other [proper] purposes[.]" Fed.R.Evid. 404(b).

6. The defendant's argument that the government has "changed its position" is unpersuasive. (Def.'s Am. Supplemental Argument at 2.) The government's opposition does not reflect a change in position. The government argues that the murder evidence "was direct evidence of allegations contained in the indictment," where "Rule 404(b) does not apply." (Gov.'s Combined Opp'n at 11.) Although the government later states that proof of motive, intent, identity, plan and absence of mistake "are [also] completely proper under

Rule 404(b)" (*id.*), this is not an indication that the government is now justifying the admission of this evidence through Rule 404(b). Instead, the government is merely articulating that if an act is part of the crime charged, "evidence of it will, by definition, always satisfy Rule 404(b)." *United States v. Alexander*, 331 F.3d 116, 126 n. 13 (D.C.Cir.2003); *see also United States v. Bowie*, 232 F.3d 923, 927 (D.C.Cir.2000).

7. The defendant avers that "at no time during the murder trial of Jack Davis did the government indicate that Jack Davis shot David Scott because he robbed Jack or James Davis of his drug money.... Nor was it ever indicated during the murder trial that Jack and James Davis were drug dealers ... or in a conspiracy to sell drugs." (*Id.* at 2.)

dence is intrinsic to the crime charged in the indictment if "it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense [or] if it was inextricably intertwined with the evidence regarding the charged offense." *Id.* at 1474 (quoting *United States v. Weeks,* 716 F.2d 830, 832 (11th Cir.1983)).

 Here, witnesses testified that the defendant shot and killed Head in 1996 because Head robbed the defendant's brother, a co-conspirator. Count One of the indictment in this case alleged that the defendant committed acts of violence and murder in furtherance of the 1993 to 2003 narcotics conspiracy charged and in retaliation for violence committed against members of the conspiracy. As such, the defendant's alleged murder of Head was part of the crime charged and was fairly subject to proof. This intrinsic evidence was not governed by Rule 404(b) and its probative value was not substantially outweighed by the danger of unfair prejudice. The ruling on the motion in limine will not be reversed, and the defendant's motion for a judgment of acquittal will be denied.

## II. MOTION FOR A NEW TRIAL

 If a motion for a new trial is timely filed, it is within the trial court's sound discretion to determine whether a new trial is warranted. United States v. Walker, 899 F.Supp. 14, 15 (D.D.C.1995). A court may "grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a); In re United States, 598 F.2d 233, 236 (D.C.Cir.1979). For a verdict to be set aside, the moving party must show that an error has occurred, that the error "was substantial, not harmless, and that the error affected the defendant's substantial rights." Walker, 899 F.Supp. at 15 (internal quotation marks omitted).

The defendant argues that the court should grant a new trial based on an alleged Jencks violation by the government. Davis claims that the government violated the Jencks Act when it failed to produce Hills's written statement describing the defendant's attempt to retrieve his belongings at the FBI. (Def.'s Am. Mot. at 6.)

 The Jencks Act provides that in criminal prosecutions brought by the United States, no statement or report in the possession of the United States that was made by a government witness is available to the defense until after the witness has testified on direct examination in the trial. 18 U.S.C. § 3500(a). After such a witness testifies, the defendant may demand that the government produce the statement for the defense. 18 U.S.C. § 3500(b). When the government "elects" not to provide the requested material, the court "shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared." 18 U.S.C. § 3500(d). However, the "Jencks Act is not a mandate compelling the trial judge to strike (or bar) a witness' testimony when a previously made statement, irrespective of the reason, cannot be produced by the Government." *United States v. Perry,* 471 F.2d 1057, 1063 (D.C.Cir. 1972). The Jencks Act merely requires the trial judge to ensure that the "defendant has access to previous statements of a witness to the fullest extent possible . . . to further the interests of justice in the search for truth." *Id.* The Act on its own does not reflect any constitutional requirement, *United States v. Augenblick,* 393 U.S. 348, 356, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), and sanctions under the Act are not automatic. *See United States v. Rippy,* 606 F.2d 1150, 1154 (D.C.Cir.1979).

Generally, the Jencks Act suggests striking testimony when the previous statement by the witness was "lost or destroyed, negligently or for an unjustified purpose." *Perry,* 471 F.2d at 1063. When assessing whether testimony should have been stricken at trial, "the trial court is required to 'weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial, in order to come to a determination that will serve the ends of justice.'" *Rippy,* 606 F.2d at 1154 (citing *United States v. Bryant,* 439 F.2d 642, 653 (D.C.Cir.1971)). When there is no showing that the government acted in bad faith in its failure to produce requested Jencks material, sanctions are not necessary. *Perry,* 471 F.2d at 1059–60.

For example, in *Perry,* the government provided all Jencks Act material to the defense counsel except for the grand jury testimony from one witness. *Id.* at 1059. The stenographic notes of the witness's testimony had been lost in the stenographer's office, and the government was unable to produce a transcript of the witness's testimony. *Id.* at 1060, 1063. The court interpreted both the words and the intent of the Jencks statute to hold that because there had "been no showing that the Government ha[d] done ... any act which ha[d] resulted in its inability to comply with an order of the court to produce the grand jury testimony[,] .... there [was] ... no basis under the statute for the application of the sanctions therein prescribed." *Id.* at 1063–64.

Here, Hills testified that he gave to an agent he could not identify by name a statement Hills had handwritten detailing the events concerning the defendant's visit to the FBI's office. At the bench conference after Hills mentioned the statement, the lawyers for both sides said they were unaware that this written statement exist-ed. The government promised to inquire as to whether a statement did exist, and if it did, to ensure that Hills would be made available for further cross-examination. However, the government asserts that when it questioned its agents about this purported statement, none of the agents remembered receiving a statement from Hills. (Gov.'s Am. Combined Opp'n to Def.'s Omnibus Mot. ("Gov.'s Am. Opp'n") at 9.) The government asserts that it conveyed this information to the defendant, *id.,* which the defendant denies. (Def.'s Am. Resp. at 7.)

The Jencks Act pertains to documents containing statements of government witnesses that are in the possession of the United States. Here, the government claimed that the prosecutors and their agents never received a written statement from Hills. Moreover, the defendant did not raise any further objection at trial or move to have Hills's testimony stricken from the record. *Id.; see United States v. McKenzie,* 768 F.2d 602, 607–08 (5th Cir. 1985) (holding that because the defendants did not renew their request for the alleged Jencks material after having requested it prior to the trial, the defendants effectively abandoned any claim to the material). Although the government's claim that it does not have Hills's previous statement is not dispositive, *McKenzie,* 768 F.2d at 607, the defense has proffered no other evidence suggesting that the government did, in fact, at the time of the trial possess a statement to produce.

Even assuming a Jencks violation occurred, a new trial is not an automatic remedy. *See United States v. Thomas,* 97 F.3d 1499, 1502 (D.C.Cir.1996) (stating that "there is no fixed rule regarding what must be done if the government violates the [Jencks] Act"). Instead, "[t]he administration of the Jencks Act is 'within the good sense and experience of the district

judge ... subject to the appropriately limited review by appellate courts.'" *Id.* (quoting *Palermo v. United States,* 360 U.S. 343, 353, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959)).

Here, no evidence suggests that the government willfully destroyed any statement Hills wrote, or that the government actually possessed one at the time of trial and negligently displaced it or failed to produce it. The government appears to have made a good faith effort to comply with the defendant's request by searching for the statement.

■ The defendant has not shown that not having any prior statement written by Hills summarizing the defendant's comments about the gun and the U-turn was of any moment. The government justified the traffic stop based upon agents' observations; it offered no testimony that the defendant admitted to an illegal U-turn. The court's pretrial finding that the traffic stop was lawful would have been unaffected by any Jencks material for Hills. Moreover, Hills told the jury that the defendant had not asked for a gun back and had not claimed that the agents had confiscated one. This testimony helped distance the defendant from a knowing possession of the gun seized. Hills gave no testimony about a gun seizure or U-turn unfavorable to the defendant that was fit to impeach. Production of any prior statement might have helped discredit aspects of Fulmer's report of his interview of Hills, but that report was not evidence and subject to impeachment anyway. The defendant has not established that production of the statement would have been of anything other than tangential importance, particularly in the face of the substantial evidence of the defendant's guilt presented at the

trial through the testimony of multiple cooperating witnesses and law enforcement officers. Thus, a new trial is not warranted.

## III. MOTION TO INTERVIEW THE JURORS

The defendant asks for permission to interview the jurors,[8] or for the court to make its own inquiry, to "discern whether the jurors relied on out-of-court sources to determine the meaning of certain terms that it requested clarification on, but more importantly, whether the jury found *all* of the elements on *all* of the counts before finding the defendant guilty of those counts." (Def.'s Am. Mot. at 11.)

### A. *Finding all elements of all counts*

The defendant argues that when the jury sent a note questioning whether it had to find all elements to convict the defendant of Count Five, the court should have answered that finding all elements on *all* counts was necessary. Because the court did not do so, the defendant claims that the jury must have concluded that with regard to Counts One through Four and Six that it was not necessary to find all of the elements in order to convict. (*See* Def.'s Am. Mot. at 12–13.) The defendant asks to interview the jurors to determine whether that is, in fact, what the jury concluded during their deliberations. (*Id.*)

■ Whether the jury followed the court's instructions is not subject to inquiry by the defendant. *United States v. Logan,* 250 F.3d 350, 380 (6th Cir.2001). Although a jury has a certain "obligation to follow the law as it is given by the trial court, ... it is a peculiar facet of the jury

**8.** Local Criminal Rule 24.2 prohibits parties from speaking with jurors after a verdict has been rendered "except when permitted by the court for good cause shown in writing." LCrR 24.2(b).

institution that once a verdict is rendered, no judicial inquiry is permitted into the jury's deliberative process to determine if in fact the court's instructions were properly followed." *United States v. D'Angelo,* 598 F.2d 1002, 1004 (5th Cir.1979); *see also Sparf v. United States,* 156 U.S. 51, 80, 15 S.Ct. 273, 39 L.Ed. 343 (1895) ("The law authorized [the jury] to adjudicate definitively on the evidence; the law presumes that they acted upon correct rules of law given them by the judge ... [and][t]he verdict therefore stands conclusive and unquestionable."). Allegations of " 'inside' influences on the jury—such as pressure among jurors, misunderstanding of instructions, a compromise verdict, or a self-imposed time limit" do not entitle a convicted defendant to question the jurors or trigger a hearing requiring jurors to testify about their verdict. *United States v. Edelin,* 283 F.Supp.2d 8, 13 (D.D.C. 2003) (citing *Logan,* 250 F.3d at 381). Federal Rule of Evidence 606(b)[9] even bars a juror from testifying on most matters relating to deliberations and the verdict, Fed.R.Evid. 606(b); *Edelin,* 283 F.Supp.2d at 13, to prevent the harassment of jurors by the defeated party and to ensure that what is intended to be a private deliberation can remain out of public scrutiny. *See McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915).

 While the law does not sanction the inquiry sought, the facts here do not warrant one either. The court instructed the jury multiple times in the final instructions regarding the necessity of finding all elements of a count before convicting the defendant of that count. (*See, e.g.,* Trial Tr. 10/25/04 p.m. at 8, 19–22, 30–33, 35–36.) The defendant did not object to the jury instructions when read to the jury in court. (Trial Tr. 10/25/04 p.m. at 39.) In fact, the defense "thought the court was very clear when it instructed the jury that the government had the burden of proving each element of each count." (Trial Tr. 11/1/04 p.m. at 8.) Thus, there is no basis in law or fact to interview the jurors as to whether they found all elements of all counts.

### B. *Extraneous sources*

The defendant argues that because the court instructed the deliberating jurors to rely upon their own memories of the evidence when they asked to be told what the weights were of certain street terms for drug quantities, "it would have been impossible for the jury to have defined the terms for themselves without relying on out-of-court sources." (Def.'s Am. Mot. at 12.) The defendant asks to interview the jurors to determine whether they did, in fact, rely on outside sources to define the weights of the drugs. (*Id.*)

 Where a defendant seeks a post-conviction jury inquiry, there should be "reasonable grounds for investigation." *United States v. Moon,* 718 F.2d 1210, 1234 (2d Cir.1983). Reasonable grounds exist "when there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *Id.* (internal citations omitted); *United States v. Connolly,* 341 F.3d 16, 34 (1st Cir.2003) (finding that

---

**9.** Federal Rule of Evidence 606(b) states in relevant part:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations ... except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.
> Fed.R.Evid. 606(b).

the defendant did not meet the "high standard" to show that an impropriety occurred where, after the trial ended, a newspaper reported that some jurors took notes *at night* despite the judge's request that they refrain from taking notes *at trial*); *United States v. Rigsby*, 45 F.3d 120, 124–25 (6th Cir.1995) (stating that a court investigation is appropriate when there is a "credible allegation of extraneous influences" but not when the defense counsel alleges juror bias for the first time after trial when the juror knew some of the witnesses and had divulged this information in court to no objection from the parties).

█ As an initial matter, the defendant did not object to the instruction. (Trial Tr. 10/28/04 a.m. at 5.) Indeed, both the defense and the prosecution agreed with giving the response to the jury's question that was given. (Trial Tr. 10/27/04 a.m. at 15, 17.) In any event, the defendant only speculates, but presents no evidence, that the jury brought in extraneous prejudicial information to define the drug weights. Speculation cannot trigger a jury inquiry.

Furthermore, although the court did not provide the definitions of the weights for the jury, multiple witnesses testified regarding the drug amounts and the terms used to describe their weights. Conner testified regarding the difference between an ounce and a "31." (Trial Tr. 10/6/04 p.m. at 62.) Henderson testified that an "eight ball" equals three-and-one-half grams of cocaine (Trial Tr. 10/7/04 a.m. at 138), and that a "62" is two-and-one-half ounces of cocaine powder. (Trial Tr. 10/7/04 a.m. at 143.) Henderson also detailed various other drug transactions made by the defendant and the corresponding weights of the drugs. (Trial Tr. 10/7/04 p.m. at 23–26, 30–35, 40, 45–48.) Harrison testified that a "31" is thirty-one grams of crack cocaine, and that it can be split into nine eight balls. (Trial Tr. 10/13/04 a.m. at 89–90.) Harrison also described how much he generally bought from the defendant and James Davis. (Trial Tr. 10/13/04 a.m. at 101–04.) Robertson testified that an eighth of a kilogram equals four-and-one-half ounces. (Trial Tr. 10/19/04 a.m. at 46.) Thomas Davis reiterated that a "31" is 31 grams, and that it is half of a "62." (Trial Tr. 10/19/04 p.m. at 95.) Richardson testified that there are 125 grams of cocaine powder in an eighth of a kilogram, fourteen grams in a half-ounce of crack cocaine, three-and-one-half grams of crack cocaine in an eight ball, and 250 grams of cocaine powder in a quarter-kilogram. (Trial Tr. 10/20/04 p.m. at 83–90.) Richardson also testified as to the difference between a "31" and an ounce. (Trial Tr. 10/21/04 a.m. at 22.)

The testimony of these witnesses was sufficient for the jury to determine drug weights. The jury needed no out-of-court sources to do so. The defendant's request for permission to interview the jurors, or for the court to conduct its own inquiry, will be denied.

## CONCLUSION AND ORDER

The evidence, viewed in the light most favorable to the government, permitted a reasonable jury to find the essential elements of a conspiracy to distribute PCP, and the government was not required to establish that the charged conspiracy existed during the exact dates mentioned in the indictment. There was no significant inconsistency in the FBI agents' testimony with regard to the defendant's traffic stop which would warrant a reversal of the court's denial of the defendant's pre-trial motion to suppress. The government properly introduced the defendant's acquitted conduct as evidence of conduct intrinsic to the conspiracy. No willful or

negligent Jencks violation warranting post-trial relief has been shown. The parties may not inquire into the jurors' deliberative process, and the defendant has not shown good cause or a reasonable basis for inquiring about possible extraneous influences on the jury's deliberations. Therefore, it is hereby

ORDERED that the defendant's motion for judgment of acquittal, for a new trial, and for a court order permitting the defendant to interview jurors [# 243] be, and hereby is, DENIED. It is further

ORDERED that the defendant's motion for a ruling [# 253] be, and hereby is, GRANTED. It is further

ORDERED that the defendant's sentencing be, and hereby is, scheduled for January 4, 2006, at 3:30 p.m.